UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| JACOB PAUTSCH, DAVID PAUTSCH, | : |  |
| TERI JOHNSON, THOMAS VRIENS, | : | **Case No. 20-cv-3859** |
| BRIAN NEUMAN, ERIKA NEUMAN, | : |  |
| WALLACE BYARS, DENNIS O'MALLEY, | : | **COMPLAINT** |
| RICHARD VESSELL, JASON GOLDSMITH, | : |  |
| JAMES DAVIS, CHARLES JAMES SHAFFER, | : |  |
| and CHARLES L. SHAFFER, JR., | : |  |
|  | : |  |
| *Plaintiffs*, | : |  |
|  | : |  |
| -against- | : |  |
|  | : |  |
| ISLAMIC REPUBLIC OF IRAN | : |  |
| Ministry of Foreign Affairs | : |  |
| Khomeini Avenue | : |  |
| United Nations Street | : |  |
| Tehran, Iran | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| SYRIAN ARAB REPUBLIC | : |  |
| Ministry of Foreign Affairs | : |  |
| Damascus, Syria | : |  |
|  | : |  |
| *Defendants*. | : |  |

-----------------------------------------------------------------x

Plaintiffs, by and through their attorneys, allege the following:

## I.  NATURE OF THE ACTION

1.      This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C.

§ 1602 *et seq.* ("FSIA"), for wrongful death, personal injury, and related torts, by United States

nationals and members of the U.S. armed forces, along with their estates and members of their

families, who were injured or killed in terrorist attacks in Iraq from 2004 to 2009.

2.      All of these attacks were committed by one or more of the U.S.-designated Foreign Terrorist Organizations ("FTOs")[1] al-Qaeda;[2] al-Qaeda in Iraq ("AQI") (later known as the Islamic State of Iraq and Syria ("ISIS"));[3] Ansar al-Islam (together, the "AQ FTOs") or other related Sunni terror cells ("Sunni Terrorist Groups in Iraq" or "STGI").[4] Each attack constituted an act, or attempted act, of torture, extrajudicial killing, and/or hostage taking.

3.      Defendants Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria") knowingly provided material support for such attacks, and did so through their officials, employees, and agents while acting in the scope of their office, employment, and agency, respectively.

4.      During the relevant period (2003-2011), Iran and Syria played a highly destabilizing role in Iraq. Both regimes sought to inflict casualties on U.S. and Coalition Forces and destabilize Iraq both to gain advantage in their ongoing regional political struggles and to prevent the creation of a stable Iraqi Government allied with the United States.

5.      In pursuit of these objectives, both regimes gave sanctuary and strategic assistance to the Sunni and Shi'a terror groups that wreaked havoc and destruction across Iraq during the relevant period.

---

[1]      As defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

[2]      The group's name can be spelled several ways in English. For consistency purposes, this Complaint uses "al-Qaeda" regardless of the naming convention used in the original source material.

[3]      ISIS is also known as the "Islamic State of Iraq and the Levant," "ISIL" and by the Arabic acronym "Daesh." For consistency purposes, this Complaint uses "ISIS" regardless of the naming convention used in the original source material.

[4]      The Sunni jihadist groups evolved over time, sometimes merging, and often splitting apart. For example, at one point, AQI was allied with the 1920 Revolutionary Brigades, Jaysh Mujahideen, and Jaysh al-Islami, but they later broke ranks. Major General Mark Hertling commanded MND-N (the northern sector of Iraq commanded by U.S. Forces) in late 2007. His staff at that time identified at least 22 different terrorist groups operating in the MND-N area of operations, many with facilitation networks extending into Syria. Counting various cells from the 2003 period, the number of terrorist groups was likely much higher.

6.      Most relevant to this Action, Iran and Syria coordinated with the Sunni Terrorist Groups in Iraq to encourage and facilitate attacks against U.S. armed forces in Iraq, as well as attacks on other American and foreign targets.

7.      The Sunni Terrorist Groups in Iraq also targeted (primarily Shi'a) Iraqi civilians and armed service members.

8.      In the years before the March 2003 U.S.-led invasion of Iraq, Iran and Syria provided substantial tangible and intangible property and services to al-Qaeda and Ansar al-Islam and their affiliates, including lodging, training, expert advice and assistance, safehouses, false documentation and identification, facilities, weapons, lethal substances, explosives, personnel, and transportation, with the intention of assisting their lethal attacks on U.S. and other foreign targets.

9.      Following the 2003 invasion, Iran and Syria provided similar material support to STGI, with the intention of assisting their lethal attacks on U.S. armed forces and other foreigners and Iraqi civilians and Iraqi armed forces.

10.      Iran provided this material support through several officials, employees, and agents, including its Islamic Revolutionary Guard Corps ("IRGC"), the IRGC's foreign operations directorate called the Qods Force ("IRGC-QF"), Iran's Ministry of Intelligence ("MOIS"), and Iran's Lebanese terror proxy, Hezbollah.

11.      The United States designated the IRGC a Specially Designated Global Terrorist ("SDGT") in October 2017[5] and an FTO in April 2019.[6] The IRGC has retained those designations through the present.

---

[5]      *See Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (U.S. Dep't of the Treasury, Oct. 13, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx.

[6]      *See Designation of the Islamic Revolutionary Guard Corps* (U.S. Dep't of State, Apr. 8, 2019), *available at* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

12.     When the U.S. Department of the Treasury ("Treasury") designated the IRGC an SDGT, it found, "[t]he IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. Iran's pursuit of power comes at the cost of regional stability, and Treasury will continue using its authorities to disrupt the IRGC's destructive activities." Treasury also designated the IRGC "for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of" the IRGC-QF.[7]

13.     The White House explained that the decision to designate the IRGC an FTO "recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign."[8]

14.     The State Department explained in connection with the IRGC's FTO designation that "[t]he Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003," "in addition to the many thousands of Iraqis killed by the IRGC's proxies."[9]

15.     The United States designated the IRGC-QF an SDGT in October 2007[10] and an

---

[7]     *See Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (U.S. Dep't of the Treasury, Oct. 13, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx.

[8]     *See Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization* (The White House, Apr. 8, 2019), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-designation-islamic-revolutionary-guard-corps-foreign-terrorist-organization/.

[9]     *See Designation of the Islamic Revolutionary Guard Corps* (U.S. Dep't of State, Apr. 8, 2019), *available at* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

[10]    *See Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (U.S. Dep't of the Treasury, Oct. 25, 2007), *available at* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

FTO in April 2019.[11] The IRGC-QF has retained those designations through the present.

16.     When Treasury designated the IRGC-QF an SDGT, it found:

> The Qods Force has had a long history of supporting Hezbollah [sic]'s military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hezbollah [sic] in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hezbollah [sic] fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hezbollah [sic] and has assisted Hezbollah [sic] in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.[12]

17.     The United States designated Hezbollah a Specially Designated Terrorist ("SDT") in January 1995,[13] an FTO in October 1997,[14] and an SDGT in October 2001.[15] Hezbollah has retained those designations through the present.

18.     The United States designated al-Qaeda an FTO in October 1999.[16] Al-Qaeda has retained that designation through the present.

19.     The United States designated AQI (including its later form, ISIS) an FTO in

---

[11]     *See Designation of the Islamic Revolutionary Guard Corps* (U.S. Dep't of State, Apr. 8, 2019), *available at* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

[12]     *See Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (U.S. Dep't of the Treasury, Oct. 25, 2007), *available at* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

[13]     *See Prohibiting Transactions with Terrorists Who Threaten To Disrupt The Middle East Peace Process* (Fed. Reg. Jan. 23, 1995), *available at* https://www.govinfo.gov/content/pkg/FR-1995-01-25/pdf/X95-110125.pdf.

[14]     *See Foreign Terrorist Organizations* (U.S. Dep't of State), *available at* https://www.state.gov/foreign-terrorist-organizations/.

[15]     *See Executive Order 13224* (U.S. Dep't of State), *available at* https://www.state.gov/executive-order-13224/.

[16]     *See Foreign Terrorist Organizations* (U.S. Dep't of State), *available at* https://www.state.gov/foreign-terrorist-organizations/.

December 2004.[17] AQI has retained that designation through the present (ISIS's FTO listing states that it is "formerly al-Qaeda in Iraq").

20.     Treasury explained that the IRGC and IRGC-QF have worked hand-in-hand with Syrian forces:

> The IRGC has trained IRGC-QF personnel in Iran prior to their deployments to Syria and has deployed at least hundreds of personnel from its conventional ground forces to Syria to support IRGC-QF operations. IRGC personnel in Syria have provided military assistance to the IRGC-QF and have been assigned to IRGC-QF units on the battlefield, where they provide critical combat support, including serving as snipers and machine gunners. Additionally, the IRGC has recruited, trained, and facilitated the travel of Afghan and Pakistani nationals to Syria, where those personnel are assigned to, and fight alongside, the IRGC-QF. The IRGC also has worked with the IRGC-QF to transfer military equipment to Syria. The IRGC used both IRGC bases and civilian airports in Iran to transfer military equipment to Iraq and Syria for the IRGC-QF.[18]

## II.   <u>JURISDICTION AND VENUE</u>

21.     This Court has jurisdiction over this matter and over Defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees, and agents.

22.     At all times relevant to this Complaint, Iran and Syria have been foreign states within the meaning of 28 U.S.C. § 1603.

23.     As detailed below, at all times relevant to this Complaint, Iran and Syria have been State Sponsors of Terrorism within the meaning of 28 U.S.C. § 1605A(h)(6).

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f).

---

[17]     *See Foreign Terrorist Organizations* (U.S. Dep't of State), *available at* https://www.state.gov/foreign-terrorist-organizations/.

[18]     *See Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority* (U.S. Dep't of the Treasury, Oct. 13, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0177.aspx.

III.    **DEFENDANTS**

A.      **Iran**

1.      **Iran's Long History of Supporting and Financing Terrorism**

25.     Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and has been responsible for bombings, kidnappings, assassinations, and other acts of international terrorism across the world.

26.     The government of Iran is politically and ideologically hostile to the United States and its allies. For four decades, Iran has consistently provided massive material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through the IRGC and Hezbollah.

27.     The United States designated Iran a State Sponsor of Terrorism in January 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.[19] Iran has retained that designation since that time.

28.     Since Iran's designation as a State Sponsor of Terrorism, the United States has attempted to deter and/or constrain Iran's sponsorship and perpetration of terrorist attacks and development of Weapons of Mass Destruction ("WMDs") by imposing a wide variety of trade and economic sanctions intended to reduce the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

29.     The IRGC is a paramilitary force answerable only to the Supreme Leader of Iran, currently Ayatollah Ali Khamenei. The IRGC's devotion to Ayatollah Khamenei is "a religious

---

[19]     *See State Sponsors of Terrorism* (U.S. Dep't of State), *available at* https://www.state.gov/state-sponsors-of-terrorism/.

imperative." The IRGC differs from, and is hierarchically superior to, Iran's "regular" armed forces, which ostensibly function under a national command structure.

30.     The IRGC is tasked with "protecting the revolution," which it accomplishes by silencing perceived domestic enemies through secret police methods and exporting it abroad by attacking perceived enemies around the world (via its IRGC-QF) through terrorist tactics. It also aids in Iran's development of WMDs, including Explosively Formed Penetrators[20] ("EFPs"), signature anti-armor weapons designed by Hezbollah and supplied by the IRGC-QF, and Improvised Rocket-Assisted Munitions ("IRAMs"), and its nuclear program.

31.     The IRGC nominally comprises five branches (Ground Forces, Air Force, Navy, Basij militia, and IRGC-QF), in addition to a counterintelligence directorate and representatives of the Supreme Leader. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747 (2007), related to their nuclear or ballistic missile activities.

32.     Iran used (and uses) the IRGC to provide material support and direction to terrorist groups in Iraq.

33.     For example, according to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq … Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."[21]

34.     The IRGC's support was provided to ostensibly incompatible Shi'a and Sunni groups, so long as they targeted U.S. forces and other Iranian enemies. These included (and

---

[20]     Sometimes referred to as "Explosively Formed Projectiles."

[21]     *See U.S. Department of State Country Reports on Terrorism* (Ch. 6) (U.S. Dep't of State), *available at* https://2009-2017.state.gov/j/ct/rls/crt/2005//index.htm.

include) Shi'a and Sunni terrorist groups in Iraq.

### 2.    Iran Provided Material Support to Terrorist Groups in Iraq

35.    On May 1, 2003, President Bush declared that "major combat operations in Iraq have ended." On May 23, 2003, the Coalition Provisional Authority, established as the interim government for Iraq, disbanded the Iraqi military forces.

36.    The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability." U.N.S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).[22]

37.    Although U.S. policy (supported by U.N. Security Council resolutions) was intended to facilitate peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. peacekeeping efforts in Iraq as a threat to its regime.

38.    Rather than engage in traditional armed conflict with the U.S. or other Coalition Forces, Iran initiated acts of international terrorism against American military personnel, Coalition Forces, and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country, in a manner that allowed it to deny that it was doing so.

39.    In addition to funding, training, and directing various Shi'a proxy groups in Iraq, the IRGC and Hezbollah also provided crucial material support to STGI including al-Qaeda and AQI, providing them with a safe haven and an operational base within Iran, as well as weapons and training.

40.    In an April 11, 2007, interview, Major General William Caldwell noted that: "We have, in fact, found some cases recently where Iranian intelligence services have provided to some

---

[22]    "Coalition Forces" is a term generally used to describe participants in the Multi-National Force – Iraq (MNF–I) that attempted to stabilize post-invasion Iraq. The United States led the "coalition" with a significant contribution from Great Britain and lesser contributions from a list of countries ranging from Australia to Poland to Mongolia.

Sunni insurgent groups some support. We do continue to see the Iranian intelligence services being active here in Iraq in terms of both providing funding and providing weapons and munitions."

41.     At a May 9, 2007, press conference, Major General Caldwell went further, noting that "we do know that there is a direct awareness by Iranian intelligence officials that they are providing support to some select Sunni insurgent elements."

42.     In February 2012, Treasury designated the Iranian Ministry of Intelligence, Iran's primary intelligence organization, as an SDGT for "its support to terrorist groups, including al-Qaeda, al-Qaeda in Iraq, Hizballah and HAMAS …."[23]

43.     The U.S. Department of the Treasury further found that "MOIS has facilitated the movement of al-Qaeda operatives in Iran and provided them with documents, identification cards, and passports. MOIS also provided money and weapons to al-Qaeda in Iraq (AQI), a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."

44.     The U.S. State Department has found that Iran has provided support to terrorist groups in Iraq and serves as "a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq."

45.     As detailed below, even though Iran's relationship with al-Qaeda and AQI was significantly less close than its relationships with its Shi'a proxies in Iraq, it spanned many years.

**B.     Syria**

46.     The United States designated Syria a State Sponsor of Terrorism in December 1979, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. Syria has retained that designation since that time.

---

[23]     *See Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (U.S. Dep't of the Treasury, Feb. 16, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

47.     Even before the U.S.-led invasion of Iraq in 2003, the Syrian regime began planning to expand its regional influence by increasing its coordination with a variety of terrorist organizations.

48.     Beginning in 2003, the Syrian regime secretly allowed armed insurgent and terrorist organizations to operate from Syria. One former Iraqi military officer who was assigned to work with Arab foreign fighters ahead of the 2003 invasion recalled that the fighters often brought with them personnel files compiled by Syrian regime officials.

49.     Providing support and transportation to foreign jihadists[24] transiting through Syria to Iraq also enabled the Syrian regime's security services to identify and track Syrian volunteers who could potentially form part of Syria's domestic (Sunni) opposition.

## IV.    SUNNI TERRORIST GROUPS IN IRAQ

50.     Sunni armed groups opposing the U.S. and Coalition Forces in Iraq comprised disparate groups: former Iraqi regime elements, Iraqi nationalists, members of the global jihadist network (including al-Qaeda), and regional criminal organizations.

51.     The Syrian regime provided safe haven and external support for most of these groups by harboring former Iraqi regime elements and facilitating the flow of foreign fighters, for whom Iraq had become a cause célèbre, attracting jihadists from across the Muslim world.

### A.    Al-Qaeda

52.     Established by Osama bin Laden in or about 1988, al-Qaeda is a global network of terrorist cells dedicated to establishing a pan-Islamic caliphate throughout the world through violent and frequently deadly means. The network's strength is reinforced by its ties to other FTOs, extremist organizations, and State Sponsors of Terrorism.

---

[24]     In the context of this Complaint, "jihad" refers to the Muslim concept of "holy war," and "jihadists" refers to individuals who believe(d) that their acts of violence were (or are) in furtherance of a holy war.

53.     Al-Qaeda has its origins in the jihad started in December 1979 by Islamists against the Soviet occupation of Afghanistan. During the 1980s, *mujahedeen*[25] from throughout the Muslim world came to Afghanistan to fight the Soviet Red Army and defend the Afghan Muslim community. From the early stages of the conflict, Osama bin Laden provided financial, organizational, and engineering aid to the *mujahedeen*.

54.     Shortly before the Soviet Red Army withdrew from Afghanistan in 1989, bin Laden became determined to spread the jihadist movement to regions outside of Afghanistan, and to wage war with the United States, which he believed was Islam's true enemy. In furtherance of that objective, bin Laden established al-Qaeda.

55.     When al-Qaeda was founded, it maintained offices in various parts of the world, including Afghanistan, Pakistan, and even in the United States at the Alkifah Refugee Center in Brooklyn. In or about 1991, al-Qaeda's leadership, including bin Laden, relocated to Sudan, where they remained headquartered until 1996. Following the failed assassination of Egyptian President Hosni Mubarak on June 26, 1995, Sudanese officials, pressured by the United States to crack down on terrorism, asked bin Laden to leave the Sudan.

56.     Bin Laden returned to Afghanistan in 1996, after the Taliban seized control of most of the country. Al-Qaeda actively supported the Taliban and violently suppressed all opposition to it. Bin Laden established several training camps for terrorism, teaching guerilla warfare, rocket warfare, demolition, and bombing.

57.     Ties between al-Qaeda and Iran began as early as April 1991, when Ayman al-Zawahiri, then the emir (commander (literally "prince")) of the Egyptian Islamic Jihad ("EIJ") – an Islamist organization and al-Qaeda affiliate – secretly visited Iran.

---

[25]     *Mujahadeen* are Muslims who engage in jihad.

58.     Zawahiri asked Iran to support EIJ's efforts to overthrow the Egyptian regime, and the regime soon began training EIJ members in both Iran and Sudan, while also providing the organization with financial support.

59.     Subsequently, EIJ operatives were also sent to Lebanon to train with Hezbollah.

60.     During this period, Sudan harbored EIJ operatives as well as al-Qaeda and Hezbollah operatives and a contingent of IRGC personnel.

61.     According to the Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report"), during this period an informal agreement between al-Qaeda and Iran was reached in Sudan (that also included EIJ and Hezbollah) through which they cooperated "in providing support—even if only training—for actions carried out primarily against Israel and the United States."[26]

62.     Bin Laden left Sudan in 1996 and returned to Afghanistan. Iran helped facilitate the transit of fellow Al-Qaeda operatives through Iran both into and out of Afghanistan.[27]

63.     During the 1990s, al-Qaeda actively pursued a campaign of terror, targeting Americans and American interests in the Middle East. Al-Qaeda attacks on U.S. interests included, but were not limited to, the:

- February 26, 1993, bombing of the World Trade Center in New York City, which killed 6 Americans and injured more than 1,000 people;

- June 25, 1996, bombing of the Khobar Towers complex in Dhahran, Saudi Arabia (used as a barracks for U.S. service members), which killed 19 American service members and one other person and injured approximately 500 people;

---

[26]     *See The 9-11 Commission Report*, p. 61 (9-11 Commission, July 22, 2004), *available at* https://govinfo.library.unt.edu/911/report/911Report.pdf.

[27]     At least eight of the 9/11 hijackers transited through Iran at one point or another.

- August 7, 1998, bombings of the U.S. embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania, which killed 224 people (including 12 Americans) and injured more than 4,000 people;

- October 12, 2000, bombing of the U.S.S. Cole in Aden, Yemen, which killed 17 American sailors and injured 39 personnel; and

- September 11, 2001, attacks on the World Trade Center and the Pentagon (the "9/11 Attacks"), which killed 2,977 people and injured more than 6,000 others.

64.     After the 9/11 Attacks, Iran permitted a wave of al-Qaeda operatives and their families, including al-Qaeda spokesman (and bin Laden son-in-law) Sulayman Abu Ghayth and al-Qaeda computer specialist Nazih Abdul-Hamed Nabih al-Ruqaii (a/k/a Abu Anas al-Libi), as well as other affiliated Sunni jihadists such as Abu Musab al-Suri and Abu Musab al-Zarqawi and their families, to enter Iran.

65.     In 2002, the Iranian regime also permitted al-Qaeda to establish a "management council" in Iran that was charged with providing strategic support to the terrorist organization's main leadership in Pakistan.

66.     Al-Qaeda's "management council" in Iran likely planned and directed two deadly May 2003 attacks, a truck bombing of a housing complex in Riyadh, Saudi Arabia and a suicide bombing in Casablanca, Morocco.

67.     On April 25, 2003, al-Qaeda declared jihad in Iraq, and in July, it established the Armed Group of al-Qaeda in Fallujah under a commander known as Abu Iyad.

68.     From 2003 onward, Iran kept certain senior al-Qaeda leaders (and their families) under a form of house arrest while simultaneously allowing the terrorist organization to use Iran as a facilitation hub for its terror networks, including in Iraq.[28]

---

[28]     On March 16, 2010, then-commander of U.S. Central Command General David H. Petraeus testified before the Senate Foreign Relations Committee that al-Qaeda "continues to use Iran as a key facilitation hub, where facilitators connect al-Qaeda's senior leadership to regional affiliates … and although Iranian authorities do

69.     This "dual track" approach served Iran's interest in harnessing al-Qaeda's violent targeting of the U.S. and its regional allies while simultaneously taking active measures to ensure that the terrorist organization's radical Sunni ideology (with its intrinsically anti-Shi'a elements) was not redirected against Iran or its interests.[29]

70.     In July 2011, the U.S. Treasury Department stated that the Iranian government had previously entered into an agreement with al-Qaeda operatives to use Iran as a transit point for funneling money and people from the Gulf to Pakistan and Afghanistan. Treasury also highlighted the role played by Ezedin Abdel Aziz Khalil (a/k/a Yasin al-Suri), a Syrian-born senior al-Qaeda operative who had operated in Iran since 2005.

71.     The Iranian regime arrested al-Suri in December 2011— at which time he had been acting as al-Qaeda's key facilitator in Iran for several years.

72.     After his arrest, al-Suri was temporarily replaced in this position by Muhsin al-Fadhli, a close confidant of bin Ladin. Under Fadhli, al-Qaeda's network in Iran began supporting the movement of fighters and money through Turkey to support al-Qaeda affiliated elements in Syria.

73.     Against this backdrop, for most of 2003, al-Qaeda maintained only a small presence in Iraq focused mainly on indoctrination, propaganda, and recruiting, as well as developing

---

periodically disrupt this network by detaining select al-Qaeda facilitators and operational planners, Tehran's policy in this regard is often unpredictable."

[29]     Al-Qaeda actually entered into an agreement with Iran in which it committed to "refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities." In return, the Iranian regime allowed the Iran-based al-Qaeda network freedom to operate, plan attacks, raise funds and travel. A U.S. Department of the Treasury designation from October 2012 sheds further light on the terms of the arrangement between al-Qaeda and Iran: *See Treasury Further Exposes Iran-Based al-Qaeda Network* (U.S. Dep't of the Treasury, Oct. 12, 2012), *available at:* https://www.treasury.gov/press-center/press-releases/Pages/tg1741.aspx (noting that under the terms of the agreement between al-Qaeda and Iran, "al-Qaeda must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qaeda network freedom of operation and uninhibited ability to travel for extremists and their families. Al-Qaeda members who violate these terms run the risk of being detained by Iranian authorities.").

smuggling networks (mostly in Syria) to bring more foreign fighters into Iraq to wage war on Coalition Forces there.

74.     As discussed below, al-Qaeda subsequently nurtured and helped finance Tawhid wal-Jihad, the extremely violent terrorist network that eventually became al-Qaeda in Iraq or AQI.

**B.     Al-Qaeda in Iraq**

75.     Abu Musab al-Zarqawi was a Jordanian national who commanded a group of Arab jihadists based in Herat, Afghanistan prior to the 9-11 Attacks committed by al-Qaeda.

76.     Following the U.S. invasion of Afghanistan in October 2001, Zarqawi led his organization to Iran, where he and his relatively small group of followers were given safe haven and relocated by Iran's MOIS to an area near Halabja in northeastern Iraq. They were also permitted to establish safe houses in Zahedan, Isfahan, and Tehran.

77.     Zarqawi spent crucial months inside Iran rebuilding his network under the IRGC's protection.

78.     He also traveled under numerous aliases, using Iranian passports likely provided by Iran's MOIS.

79.     With Iran's assistance, Zarqawi set up his operations in the Kurdish region of Iraq and developed ties to Ansar al-Islam, a Kurdish terrorist group that had also fought in Afghanistan as part of an array of Sunni jihadist organizations.

80.     Zarqawi's terror network initially operated in Iraq under the name "Tawhid wal-Jihad."

81.     For most of 2003, despite several spectacular terror attacks, Zarqawi's network only maintained a limited presence in Iraq, and largely focused on propaganda, recruiting, and developing smuggling networks to facilitate the flow of foreign fighters into the country.

82.     Among the spectacular Zarqawi-orchestrated terror attacks of 2003 were the August 7, 2003, car bombing of the Jordanian Embassy in Baghdad that killed 17 and wounded 40, and the August 19, 2003, truck bomb that struck the newly established U.N. headquarters in Baghdad, killing 22 people, including Sérgio Vieira de Mello, the U.N. special representative in Iraq.

83.     On August 28, 2003, a suicide car bomb driven by Zarqawi's Jordanian father-in-law, Yassin al-Jarad, detonated outside of the Imam Ali Mosque in Najaf, killing prominent Shi'a leader Mohammed Baqr al-Hakim and nearly 100 others.

84.     In response to these atrocities, in September 2003, Treasury designated Zarqawi as an SDGT, noting his ties to al-Qaeda and Hezbollah.[30]

85.     In October 2004, Zarqawi formally pledged allegiance to Osama bin Laden and changed his organization's name to Qa'idat al Jihad fi Bilad ar Rafidain (al-Qaeda in the Land of the Two Rivers), better known as al-Qaeda in Iraq—*i.e.*, AQI.

86.     In October 2004, the United States designated Tawhid wal-Jihad an FTO.[31]

87.     Thus, Tawhid wal-Jihad evolved from a semi-independent jihadist group into a part of al-Qaeda in late 2004 and early 2005.

88.     Osama bin Laden named Zarqawi emir (commander) of al-Qaeda forces in Iraq in January 2005.

89.     At the same time, Zarqawi met with leaders of Ansar al Sunna and Jaysh Muhammad in Abu Ghraib in early January 2005 to plan a joint campaign against the Shi'a-led

---

[30]     *See Treasury Designates Six Al-Qaida Terrorists* (U.S. Dep't of the Treasury, Sept. 24, 2003), *available at* https://www.treasury.gov/press-center/press-releases/Pages/js757.aspx.

[31]     *See Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (U.S. Dep't of State), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm.

government in Baghdad.[32]

90.     From 2004 to 2006, AQI's organizational structure depended heavily on Zarqawi's charisma.

91.     Zarqawi led by example, personally beheading two captured American civilians in May and September 2004.

92.     By 2005, Zarqawi was receiving considerable external financial support from al-Qaeda's senior leaders, who recognized Iraq's central place in the global jihad.

93.     AQI conducted countless attacks against foreign and Iraqi military and civilian targets. Its attacks on civilians included bombings against largely Shi'a targets in Sadr City, Baghdad, as well as attacks and suicide bombings against various Iraqi officials, community leaders and rivals, and the Yazidi community. AQI sought to ignite a sectarian war pitting Sunnis against Shi'a, stoking violence between Iraq's Sunnis and Shi'a. AQI's attacks against military targets focused on American personnel.

94.     AQI's sectarian violence included indiscriminate attacks on the Shi'a community, as well as targeted high-profile attacks such as the February 2006 bombing of the Askari Shrine in Samarra, one of the holiest shrines in Shi'a Islam. Mass-casualty suicide bombings typified AQI's violence, which contributed to the development of a full-scale Sunni-Shi'a civil war in Iraq. Thousands of Iraqi civilians fell victim to AQI attacks between 2003 and 2007.

95.     AQI also targeted American personnel in violent attacks.[33]

96.     At its height, AQI had an estimated 5,000 – 10,000 operatives, many of whom came

---

[32]     Ansar al Sunna would become an ally of AQI while Jaysh Muhammad would become a bitter rival.

[33]     AQI also employed a significant number of suicide-driven Vehicle-Borne Improvised Explosive Devices ("VBIEDs"), both against Iraqi civilians and American and Coalition Forces.

from outside Iraq. AQI came to control large parts of Iraqi territory between 2005 and 2008. By Autumn 2006, it had taken control of Baqubah, the capital of Diyala Province; by March 2007, AQI had claimed it as its capital. AQI was the dominant power in Al Anbar Province, with strongholds throughout the region in 2006; by 2007 it had expanded to Mosul as well.[34]

97.     AQI continued to expand even after Zarqawi's death in a U.S. airstrike in June 2006.

98.     However, its continued fanaticism, marked not only by frequent atrocities committed against Shi'a civilians but also against competing Sunni insurgent groups, helped propel a burgeoning "Sunni Awakening" movement against it in Al Anbar Province.

99.     Together with a surge of U.S. forces beginning in 2007, the Sunni Awakening helped weaken AQI significantly, and for several years both its influence and its capacity to launch attacks was downgraded, though it was never extinguished.

100.     Among the causes of AQI's resilience were its continued access to safe havens in Syria and its continued ability to transit foreign fighters from Saudi Arabia, Tunisia, Libya, Syria, and other Muslim countries through Syria and into northern Iraq.

101.     AQI also benefited from continued financial support from al-Qaeda and its support network in Iran.

102.     Therefore, although severely challenged during the years 2007-2011, AQI was never fully defeated and continued to launch horrific terrorist attacks targeting U.S. service members and others during the relevant period.

---

[34]     In January 2006, Zarqawi established an umbrella organization, the Mujahideen Shura Council ("MSC"), in collaboration with five other Sunni Islamist groups. This organization represented the broadening of AQI's goals toward increased Sunni collaboration and a desire to transition from insurgency to creating an Islamic State. Zarqawi was killed in a U.S. airstrike on June 7, 2006, and in October 2006, after AQI's new leadership structure was formed, AQI began referring to itself as the Islamic State of Iraq. As noted above, in this Complaint, AQI is used rather than Islamic State or ISIS.

### C.       Former Hussein Regime Elements and Other Sunni Terror Cells

#### 1.       Jaysh Muhammad (Army of Muhammad)

103.    Jaysh Muhammad (Army of Muhammad) was a Sunni organization originally directed and founded by Saddam Hussein, who managed its initial operations from his hiding spot in Ad Dawr in Salahadin, Iraq.

104.    The group planned to wage a guerrilla warfare campaign against the U.S.-led coalition to restore the Iraqi Ba'ath party to power.

105.    Jaysh Muhammad initially consisted of a small cadre of low- and mid-level Ba'athist and relied upon existing Iraqi Ba'ath Party networks, political leadership, and militias – much of it operating from Syria with the help of the Syrian regime.

106.    It also developed a relationship with a National Islamic Resistance front led by a former Iraqi colonel and Saddam's half-brother, Sabawi Ibrahim al-Tikriti, the latter based in Syria.

107.    Tikriti made an agreement with Syrian leaders whereby members of the group could purchase supplies inside Syria at reduced prices, transit the Iraq-Syria border with ease, and receive direct support from Syria through the Syrian branch of the Ba'ath Party.[35]

108.    The organization's deals with the Syrian regime allowed its members to purchase supplies in Syria and infiltrate fighters back and forth across the border with Iraq.

109.    Thanks to having plentiful resources at its disposal, Jaysh Muhammad eventually expanded its terrorist activities from Anbar to Ninawa, Salahadin, Tamim, Diyala, and Baghdad.

---

[35]    The Syrian regime was flexible when it needed to be. When former regime elements suffered crippling setbacks in early 2005, the Syrian regime, sensing that his utility had come to an end, handed Tikriti over to coalition custody.

### 2.    Jaysh al-Islami (Islamic Army of Iraq)

110.    Jaysh al-Islami (Islamic Army of Iraq) was formed by a former Iraqi military intelligence colonel named Mohammed Kazem al-Janabi to carry out the former Iraqi regime's intelligence service's final orders to continue fighting in the event U.S.-led Coalition Forces overthrew the regime.

111.    Unlike AQI and certain other terrorist organizations, Jaysh al-Islami prosecuted a more traditional guerrilla war, first against the U.S.-led Coalition Forces, and later against the new Iraqi Army, the reconstituted Iraqi police, and the Iraqi Government.

112.    Its members were drawn primarily from the Janabi, Ubaydi, and Zobai tribes and saw themselves as the institutional continuation of the Iraqi military that was defeated in April 2003.

113.    Like Jaysh Muhammad, the Jaysh al-Islami leadership maintained a strict, military-style hierarchy and chain of command among its terror cells.[36]

114.    Like Jaysh Muhammad, Jaysh al-Islami also used Islamic imagery and themes in describing its organization and employed Islamist rhetoric as a major component of its recruiting efforts and propaganda.

### 3.    1920 Revolutionary Brigades

115.    In 2003, former members of the Iraqi military founded the 1920s Revolution Brigades, named after the 1920 Iraqi uprising against British colonial rule.

116.    Between 2003 and 2007, the 1920s Revolution Brigades focused most of its efforts on attacking U.S. soldiers and bases.

---

[36]    On March 27, 2007, AQI carried out a suicide attack that killed a leader of the 1920 Revolutionary Brigades. By Summer 2007, the 1920s Revolution Brigades, Jaysh al-Islami, and other Sunni "insurgent" groups had turned against AQI and began actively fighting them.

117.     In Summer 2007,[37] the 1920s Revolution Brigades fought AQI in Anbar Province but later joined forces with ISIS in 2014.

### 4.     Ansar al-Islam

118.     Ansar al-Islam is a terrorist group composed of mainly Kurdish Islamists who had fought in Afghanistan and who violently opposed the more mainstream Kurdish militias (peshmerga) in Iraq.

119.     Ansar al-Islam began as an offshoot of the Islamic Movement of Kurdistan ("IMK") that became affiliated with al-Qaeda and engaged in an active war with the Patriotic Union of Kurdistan ("PUK").

120.     Ansar al-Islam's leaders, Mullah Krekar[38] and Abu Abdullah al-Shafi, worked openly with al-Qaeda, and al-Qaeda, in turn, provided resources, training, and guidance to the group, enabling it to carve out a miniature Islamic state in the Halabjah area of Iraq.[39]

121.     Despite its aggressive Sunni jihadist ideology, Ansar al-Islam was given safe harbor by Iran because the organization opposed Saddam Hussein's regime and was a destabilizing force opposed to the United States and its allies.

122.     When the U.S.-led invasion destroyed Ansar al-Islam's operating bases in and around Halabjah, most of the organization's surviving operatives fled to Iran, while a critical subset of its operatives went to ground in what became known as the "Sunni Triangle."

123.     In both Iran and within the Sunni Triangle, these operatives joined forces with al-Qaeda and other Islamist resistance groups.

---

[37]     In March 2007, a splinter group calling itself "Hamas of Iraq" broke off from the organization.

[38]     Krekar lived in Iran for a time before fleeing to Norway.

[39]     Reports suggest that Ansar al-Islam was formed in late 2001, when Osama bin Laden and Kurdish Islamist groups decided to combine their efforts in northern Iraq.

124.    In relatively short order, Ansar al-Islam established a network of safe houses and other logistics operations for foreign fighters inside Iraq and were able to use that network to regroup and broaden their appeal to Iraqis beyond Kurdistan, extending its reach to Fallujah, Tikrit, Bayji, and Baghdad.

125.    In Anbar Province, this new branch of Ansar al-Islam established ties to al-Qaeda, which influenced Ansar al-Islam to develop a cell-based structure similar to al-Qaeda's, each of which was organized into small units of 10 to 15 members led by an emir/commander.

126.    After June 2003, Ansar al-Islam's preferred method of attack was the use of suicide bombers.[40] At that time, it had an estimated 2,000 operatives inside Iraq.

127.    By midsummer 2004, Ansar al-Islam and other insurgent groups had taken control of the strategic city of Tel Afar, about 80 kilometers west of Mosul astride the main highway to Syria.

### 5.    Ansar al-Sunna

128.    Ansar al-Sunna was a splinter group formed from dissident factions of Ansar al-Islam.

129.    It initially focused much of its violence on traditional enemies, the PUK, and the Turkish military presence in Iraq.

130.    In December 2005, the U.S. military described Ansar al Sunna as "a terrorist organization with links to terrorists in Syria and Iran," which has "committed multiple suicide bomb attacks in Iraq that have resulted in the deaths of Coalition Forces, Iraqi Army Soldiers, Iraqi policemen and Iraqi citizens."

131.    Though Ansar al-Sunna frequently targeted Coalition Forces, by May 2007 it had

---

[40]    Ansar al-Islam's ideological affinity with al-Qaeda meant that its core ideology now accepted participants in suicide bombings as "shahids," or martyrs, in a jihad campaign against the enemies of God.

joined the Jihad and Reform Front united against AQI in Anbar Province.

132.    Yet, by 2008 Ansar al Sunna had rejoined AQI's efforts. One of its trademarks was to orchestrate the rape of Iraqi women who could then be psychologically shamed into becoming suicide bombers.

133.    In 2008 alone, AQI and Ansar al Sunna launched 36 attacks by female suicide bombers.

## V.    IRAN PROVIDED MATERIAL SUPPORT AND RESOURCES TO AL-QAEDA AND AQI

134.    As noted above, Iran has long provided substantial material support and resources to al-Qaeda. According to U.S. intelligence reports, the relationship between Iran and al-Qaeda dates to the early 1990s, when al-Qaeda officials met with Iranian intelligence officials to establish an anti-American partnership.

135.    According to the U.S. federal indictment filed against Osama bin Laden, al-Qaeda "forged alliances with the National Islamic Front in the Sudan and with representatives of Iran, and its associated terrorist group Hizballah, for the purpose of working together against their perceived common enemies in the West, particularly the United States."[41]

136.    According to the testimony of Ali Mohammed, an Egyptian-born U.S. Green Beret who pleaded guilty to conspiring with bin Laden to bomb the U.S. embassies in Nairobi and Dar es Salaam, Iran used Hezbollah to supply explosives and explosives training to al-Qaeda operatives.

137.    Iran, either directly or through its proxy, Hezbollah, has provided critical and substantial financial and logistical support to al-Qaeda. According to the 9/11 Commission Report:

---

[41]    *See United States of America v. Usama Bin Laden*, p. 7 (S.D.N.Y. Nov. 4, 1998), *available at* https://www.asser.nl/upload/documents/DomCLIC/Docs/NLP/US/US_v_Usama_bin_Laden_et_al_Indictment_1998.pdf.

In late 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support—even if only training—for actions carried out primarily against Israel and the United States. Not long afterward, senior al-Qaeda operatives and trainers traveled to Iran to receive training in explosives. In the fall of 1993, another such delegation went to the Bekaa Valley in Lebanon for further training in explosives as well as in intelligence and security. Bin Ladin reportedly showed particular interest in learning how to use truck bombs such as the one that had killed 241 U.S. Marines in Lebanon in 1983. The relationship between al-Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations.

9/11 Commission Report at 61.

138.    On various occasions during the early- to mid-1990s, high-ranking al-Qaeda members met with Imad Mughniyeh, then head of Hezbollah's terrorism directorate known as the Islamic Jihad Organization, to discuss cooperating in attacks against the United States. Bin Laden himself met with Mughniyeh in the Sudan in 1994; IRGC Brigadier General Mohammad Baqr Zolqadr was also present.

139.    Between 1992 and 1996, al-Qaeda, Hezbollah and IRGC representatives met to arrange a tripartite agreement to work together to wage terrorism against the United States, Israel, and other Western countries.

140.    Pursuant to this tripartite agreement, Hezbollah provided explosives training for al-Qaeda and al-Qaeda affiliate EIJ, and Iran supplied EIJ with weapons.

141.    According to the 9/11 Commission Report, al-Qaeda had been perfecting its expertise with explosives with Hezbollah's help since 1993-1994:

Al-Qaeda had begun developing the tactical expertise for such attacks months earlier, when some of its operatives—top military committee members and several operatives who were involved with the Kenya cell among them—were sent to Hezbollah training camps in Lebanon.

9-11 Commission Report at 68.

142.    Mughniyeh personally trained al-Qaeda operatives, in conjunction with Iranian government officials in Iran and IRGC officers working at the Iranian embassy in Beirut.

143.    In 1996, a delegation from al-Qaeda led by senior al-Qaeda official Saif el Adel went to Iran to discuss establishing an al-Qaeda base in the region around the Iran-Afghanistan border. As a result of those meetings, Iran and al-Qaeda agreed to establish a joint base for training al-Qaeda and Hezbollah terrorists.

144.    In or around this time (1996), Saif el Adel moved to Iran and began coordinating al-Qaeda operations within that country's borders.

145.    According to the 9/11 Commission Report, "[i]ntelligence indicates the persistence of contacts between Iranian security officials and senior al-Qaeda figures after Bin Ladin's return to Afghanistan [in 1996]." Additionally, "Iranian officials…facilitate[d] the travel of al-Qaeda members through Iran, on their way to and from Afghanistan. For example, Iranian border inspectors would be told not to place telltale stamps in the passports of these travelers. Such arrangements were particularly beneficial to Saudi members of al-Qaeda." 9-11 Commission Report at 240.

146.    Shortly before September 11, 2001, members of al-Qaeda's leadership, including Saad bin Laden, one of Osama bin Laden's sons, met with Iranian officials to secure a safe place for al-Qaeda leadership to retreat following the 9/11 Attacks. According to the U.S. government, Saad bin Laden, and several other senior al-Qaeda officials (including Saif el Adel), retreated to Iran from Afghanistan following the 9/11 Attacks and were harbored there.

147.    Iran permitted those al-Qaeda officials to recruit new members, train terrorist cells, and coordinate, plan, and fund new terrorist attacks around the world.

148.    After the 9/11 Attacks, with American forces actively engaging the Taliban and al-

Qaeda in Afghanistan, Iran became a transit route, safe haven, and staging area for al-Qaeda operatives and leaders.

149.    For example, following a September 17, 2008, attack on the U.S. embassy in Sana'a, Yemen, that killed 18 people and injured 16, Ayman al-Zawahiri, al-Qaeda's second in command, wrote a letter thanking the IRGC's leadership for assisting al-Qaeda to set up its network in Yemen. In the letter, which paid tribute to Iran's generosity, al-Zawahiri states that it would not have been possible to carry out the terrorist attack without Iran's "monetary and infrastructure assistance."[42]

150.    As noted above, when the U.S. Department of the Treasury designated MOIS an SDGT in February 2012, it explicitly cited "its support of terrorist groups, including al-Qaeda, al-Qaeda in Iraq, Hizballah and HAMAS…" and further noted that "MOIS has facilitated the movement of al-Qaeda operatives in Iran and provided them with documents, identification cards, and passports. **MOIS also provided money and weapons to al-Qaeda in Iraq (AQI)** … and negotiated prisoner releases of AQI operatives." (Emphasis added.)

A.      **Iran Allowed al-Qaeda to Operate a Facilitation Network Within Its Borders**

151.    As noted above, in the mid-1990s, Iran entered an arrangement with al-Qaeda whereby al-Qaeda operatives could safely transit through Iran to and from Afghanistan. This agreement expanded to allow al-Qaeda to direct a facilitation network inside Iran that served as a pipeline for operatives, weapons, and money to flow throughout al-Qaeda's global network.

152.    The initial safe transit agreement served a very tangible purpose: it gave al-Qaeda freedom of movement it would not otherwise have. In 1996, after the Taliban seized power and Bin Laden relocated to Afghanistan, al-Qaeda attracted a steady stream of volunteers, many of

---

[42]      Con Coughlin, "Iran receives al-Qaeda praise for role in terrorist attacks," *The Telegraph*, Nov. 23, 2008.

whom wanted to attend the terrorist training camps that were being established. As stated above, Iranian border officials would not stamp the passports of al-Qaeda terrorists, thereby hiding their movements.

153.    Following the 9/11 Attacks and the subsequent entry of American military forces into Afghanistan, Mustafa Hamid, a senior al-Qaeda operative who, according to the U.S. Department of the Treasury,[43] "served as a primary interlocutor between al-Qaeda and the Government of Iran," and Mahfouz Ibn al-Walid (a.k.a. Abu Hafs the Mauritanian), accompanied by two IRGC members, traveled to Tehran to negotiate on al-Qaeda's behalf to relocate al-Qaeda families to Iran. Abu Hafs eventually gained an audience with Major General Qasem Soleimani, then head of the IRGC-QF, to ask for sanctuary.

154.    The IRGC-QF eventually approved the request. Once settled in Iran, Hamid continued his role as intermediary, facilitating contacts between the IRGC and a senior al-Qaeda leader.

155.    By 2007, according to a letter Osama Bin Laden wrote to a subordinate, "Iran is our main artery for funds, personnel, and communication."

156.    In July 2011, Treasury designated "six members of an al-Qaeda network headed by Ezedin Abdel Aziz Khalil (a.k.a. Yasin al-Suri), a prominent Iran-based al-Qaeda facilitator, operating under an agreement between al-Qaeda and the Iranian government," further noting the U.S. government's effort to expose "Iran's secret deal with al-Qaeda allowing it to funnel funds

---

[43]     *See Treasury Targets Al Qaida Operatives in Iraq* (U.S. Dep't of the Treasury, Jan. 16, 2009), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp1360.aspx.  Another al-Qaeda operative who was designated was Ali Saleh Husain, a close associate of Osama bin Laden. Husain "facilitated the move of al-Qaeda - associated fighters, including an al-Qaeda military commander, from Afghanistan to Iran. After leaving Afghanistan, Husain was responsible for smuggling al Qaida members and associates via networks in Zahedan, Iran."

and operatives through its territory."[44]

157.    Similarly, Yasin al-Suri was designated an SDGT by the U.S. Department of the Treasury on July 28, 2011, for his pivotal role overseeing the transfer of fighters and weapons through Iran, collecting funds from various donors and fundraisers throughout the Persian Gulf and "moving significant amounts of money via Iran for onward passage to al-Qaeda's leadership in Afghanistan and Iraq."[45]

158.    Several of the U.S. Department of the Treasury's concomitant designations on July 28, 2011, showcase Iran's ongoing support for al-Qaeda's terrorist activities, including attacks in Iraq:

- Atiyah Abd al-Rahman was al-Qaeda's overall commander in Pakistan's tribal areas. He "was previously appointed by Usama bin Laden to serve as al-Qaeda's emissary in Iran, a position which allowed him to travel in and out of Iran with the permission of Iranian officials."

- Umid Muhammadi planned multiple attacks in Iraq and trained terrorists in the use of explosives. He was "an al-Qaeda facilitator and key supporter of al-Qaeda in Iraq (AQI) [who] petitioned Iranian officials on al-Qaeda's behalf to release operatives detained in Iran."

- Salim Hasan Khalifa Rashid al-Kuwari, based in Qatar, provided funding for al-Qaeda operations, including hundreds of thousands of dollars in financial support. He provided financial and logistical support "primarily through al-Qaeda facilitators in Iran," and also "facilitated travel for extremist recruits on behalf of senior al-Qaeda facilitators based in Iran."

- Ali Hasan Ali al-Ajmi, based in Kuwait, facilitated terrorists' travel to Afghanistan and "provide[d] financial and facilitation support to al-Qaeda, AQI and the Taliban."

---

[44]    *See Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (U.S. Dep't of the Treasury, July 28, 2011), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

[45]    *See OFAC Recent Actions* (U.S. Dep't of the Treasury), *available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20110728.aspx.

159.     The U.S. government has identified other key members of al-Qaeda's network in Iran who facilitated its global terrorism with Iran's support.

160.     In October 2012, the U.S. Department of the Treasury designated Adel Raqi Saqr al-Wahabi al-Harbi, "a key member of an al-Qaeda network operating in Iran and led by Iran-based al-Qaeda facilitator Muhsin al-Fadhli."[46]

161.     According to then Under Secretary for Terrorism and Financial Intelligence David S. Cohen, the designation "underscore[d] that Iran continues to allow al-Qaeda to operate a core pipeline that moves al-Qaeda money and fighters through Iran to support al-Qaeda activities in South Asia. This network also sends funding and fighters to Syria."

162.     In designating the IRGC an FTO in 2019, the State Department again noted that "Iran continues to allow Al-Qaeda (AQ) operatives to reside in Iran, where they have been able to move money and fighters to South Asia and Syria." As an example, the designation explained that "[i]n 2016, the U.S. Treasury Department identified and sanctioned three senior AQ operatives residing in Iran and noted that Iran had knowingly permitted these AQ members, including several of the 9/11 hijackers, to transit its territory on their way to Afghanistan for training and operational planning."

**B.     Iran Provided Material Support to Sunni Terrorists Groups in Iraq**

163.     As noted above, Osama bin Laden wrote to AQI leaders in 2007: "Iran is our main artery for funds, personnel, and communication."

164.     The IRGC played a central role in providing financial and material support for attacks against American and Coalition Forces in Iraq.

165.     In January 2008, the U.S. Department of the Treasury designated IRGC Brigadier

---

[46]     *See Treasury Further Exposes Iran-Based Al-Qa'ida Network* (U.S. Dep't of the Treasury, Oct. 18, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1741.aspx.

General Ahmed Foruzandeh for attempting to finance suicide bombings against Coalition Forces in Salah Ad Din Province, Iraq using a Sunni terrorist organization in Iraq.[47]

166.    The U.S. Department of the Treasury designated Abd al-Rahman Khalaf Ubayd Juday al-Anizi in August 2014, noting his activities "since at least 2008" — which included working "with an ISIS facilitator to pay for the travel of foreign fighters moving from Syria to Iraq" and being involved in extremist facilitation activities with Iran-based al-Qaeda facilitators…."

167.    Iran also had ties with other STGI, including Ansar al-Islam (discussed above). For example, Muhammad Hisham Muhammad Isma'il Abu Ghazala, described by the Iraqi government as an Ansar al-Islam operative, was designated an SDGT in September 2011.[48]

168.    The U.S. Department of State identified Abu Ghazala as a Hamas operative with "links to Iran" and described him an "improvised explosive device (IED) facilitator with connections to multiple IED networks throughout northern Iraq and is also responsible for disseminating numerous remote detonation device designs used by former regime elements and terror organizations in Iraq."[49]

## VI.    SYRIA PROVIDED MATERIAL SUPPORT AND RESOURCES TO SUNNI TERRORIST GROUPS IN IRAQ

169.    Syria provided this material support to STGI at the behest and direction of Syrian President Bashar al-Assad through Syrian military and intelligence officials, employees, and agents.

---

[47]      *See Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (U.S. Dep't of the Treasury, Jan. 9, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp759.aspx.

[48]      *See Recent Actions: Anti-Terrorism Designations; Cuba Designation Removed* (U.S. Dep't of the Treasury, Sept. 22, 2011), *available at* https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20110922.

[49]      *See Terrorist Designation of HAMAS Operative Muhammad Hisham Muhammad Isma'il Abu Ghazala* (U.S. Dep't of State, Sept. 22, 2001), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2011/09/173352.htm.

170.    The Syrian regime regarded support for STGI infiltration into Iraq as a high priority, assigning Bashar al-Assad's own brother-in-law, Assef Shawkat, to supervise the operation.

171.    A former Syrian provincial governor later revealed that after the 2003 invasion the Syrian regime formed an alliance with al-Qaeda and that "all Arabs and other foreigners were encouraged to go to Iraq via Syria, and the Syrian government facilitated their movements."

172.    One of AQI's most influential leaders, Sheikh Abdullah Janabi, was based in Syria and coordinated with AQI financier Brigadier General Ali Dawud Sulayman Nayil al-Khalifawi, who, among other things, coordinated AQI's activities in Fallujah, beginning in 2004.

173.    The Syrian regime not only provided sanctuary to foreign jihadists and Iraqi insurgents but also transited them to the Iraqi border.

174.    By Summer 2005, the media began describing the upper Euphrates River Valley linking the Syrian-Iraqi border as "Iraq's Ho Chi Minh Trail," as shorthand for supply route fueling the violent insurgency in Iraq during that period.

175.    In fact, beginning in 2003, with the consent and assistance of the Syrian regime, Zarqawi and other insurgents created networks inside Syria that facilitated the movement of fighters from around the Arab world to suicide bombers or fighters in Iraq.

176.    From the Damascus airport, foreign fighters transited into Iraq's Euphrates River Valley or the Jazeera desert of Ninawa Province.

177.    MNF-I's intelligence analysts estimated that 100 to 125 foreign fighters entered Iraq each month through the Euphrates River Valley route.

178.    U.S. Central Command ("CENTCOM") assessed that 65 to 75 percent of the foreign fighters entering Iraq came through Syria, with Damascus serving as a "funnel point for foreign fighter entry to Syria."

179.    One of the key AQI operatives exploiting the "funnel point" was a Syrian-based[50] Iraqi named Badran Turki al-Mazidih—also known as "Abu Ghadiyah," but he was not alone.

180.    A former Iraqi military officer named Suhail Hammo[51] oversaw a network that sent STGI fighters into Iraq from the Syrian border town of Qamishli.

181.    The Syrian regime also supported Izzat Ibrahim al-Douri,[52] the former deputy leader of Saddam's Ba'athist regime, providing his network with weapons via Syria's intelligence services.

182.    The Syrian regime also allowed vital components for the car bombs used by AQI to transit through at least two infiltration routes, or rat lines, that originated in Syria.

183.    During the second half of 2003 and throughout 2004 and 2005, the security situation in Iraq deteriorated as STGI flooded across the border from Syria, launching an avalanche of terrorist attacks.

184.    In 2005, extensive reconnaissance conducted by the U.S. military in and around Sinjar, an Iraqi town not far from the Syrian border that was a key transit station for AQI and other STGI, revealed a vast network of "safe houses, weapons caches, transportation companies, [and] passport counterfeiters" and revealed the depth of the Syrian regime's complicity in assisting AQI and other STGI.

---

[50]    Abu Ghadiyah divided his time between the eastern Syrian cities of Deir ez Zour and Albu Kamal.

[51]    Hammo later became a senior ISIS leader.

[52]    Douri became a de facto ally of Zarqawi and AQI, using his former Iraqi Intelligence Service contacts to smuggle Syrian weapons into Iraq.

185.     Facing both mounting U.S. casualties and an increasingly unstable political situation, in July 2005, General John Abizaid, then head of CENTCOM, wrote a letter to Secretary of Defense Donald Rumsfeld asserting: "We must send a clear message that they [Syria] will either secure their borders to include insurgent flow in and out or we will do it for them."

186.     But the Syrian regime did not merely harbor and provide safe passage to al-Qaeda and other STGI, it also provided them with a safe haven when these terrorist operatives were forced to flee Iraq.

187.     For example, confronted with an offensive in May 2006 by the U.S. Army's 1st Battalion, 506th Infantry Regiment, many senior and mid-level AQI members gravitated to safe havens in Syria.

188.     In December 2007, the U.S. Department of the Treasury designated Fawzi Mutlaq Al-Rawi, the leader of the Iraqi wing of the Syrian Ba'th Party, as an SDGT for providing financial and material support to AQI.[53]

189.     According to the U.S. Department of the Treasury: "Al-Rawi was appointed leader of the Iraqi wing of the Syrian Ba'th Party by Syrian President Bashar Al-Asad in 2003. The Iraqi wing of the Syrian Ba'th Party has since provided significant funding to Iraqi insurgents at Al-Rawi's direction. Al-Rawi is supported financially by the Syrian Government and has close ties to Syrian Intelligence."

190.     The U.S. Department of the Treasury also found that in November 2005, Al-Rawi "facilitated the provision of $300,000 to members of AQI. In addition, he provided AQI with vehicle-borne improvised explosive devices, rifles, and suicide bombers at the request of a senior AQI leader in Iraq. Al-Rawi and that same leader in September 2005 attended a meeting in Ar

---

[53]     *See Treasury Designates Individuals with Ties to Al Qaida, Former Regime* (U.S. Dep't of the Treasury, Dec. 7, 2007) *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp720.aspx.

Ramadi, Iraq, with other senior AQI representatives where they discussed financing, unifying AQI forces, conducting airborne improvised explosive device attacks against" U.S. facilities in Iraq.

191.    A 2007 U.S. Department of Defense report on the sources of instability in Iraq noted that "Syria remains the primary foreign fighter gateway into Iraq. Despite its heightened scrutiny of extremists and suspected insurgents, Damascus appears to want to appease Islamist extremist groups. Damascus also recognizes that Islamist extremists and elements of the former Iraqi regime share Syria's desire to undermine Coalition efforts in Iraq."[54]

192.    In February 2008, the U.S. Department of the Treasury designated Abu Ghadiyah an SDGT, finding that he "runs the AQI facilitation network, which controls the flow of money, weapons, terrorists, and other resources through Syria into Iraq," "obtained false passports for foreign terrorists, provided passports, weapons, guides, safe houses, and allowances to foreign terrorists in Syria and those preparing to cross the border into Iraq," and used donated funds "to support anti-U.S. military elements and the travel of AQI foreign fighters."[55]

193.    The U.S. Department of the Treasury also found that Abu Ghadiyah "facilitated the movement of AQI operatives into Iraq via the Syrian border" and "also directed another Syria-based AQI facilitator to provide safe haven and supplies to foreign fighters."

194.    By mid-2008, the U.S. military had degraded the Syria-based foreign fighter network that had funneled thousands of STGI terrorists into Iraq, but it had not destroyed it.

---

[54]    Measuring Security and Stability in Iraq (Dep't of Defense, March 2007), Report to Congress in accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289), p. 17, *available at* https://archive.defense.gov/home/pdf/9010_March_2007_Final_Signed.pdf.

[55]    *See Treasury Designates Members of Abu Ghadiyah's Network Facilitates flow of terrorists, weapons, and money from Syria to al Qaida in Iraq* (U.S. Dep't of the Treasury, Feb. 28, 2008), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp845.aspx.

195.    For example, between February and April 2008, AQI attacked nine coalition and Iraqi combat outposts in Mosul with large suicide car or truck bombs smuggled from Syria, destroying several of the compounds.[56]

196.    On October 26, 2008, U.S. forces crossed the Syrian border and launched an operation in the Syrian town of Albu Kamal that resulted in the death of Abu Ghadiyah, the long-time head of AQI's vast foreign fighter facilitation network in Syria. Since 2005, most of al-Qaeda's foreign fighters (including most AQI suicide bombers) had been funneled into Iraq with the Syrian regime's assistance by Abu Ghadiyah and his network of facilitators.

197.    On February 20, 2009, U.S. and Iraqi forces launched Operation NEW HOPE, targeting AQI (now ISIS) strongholds and arresting Ahmad Mohammed Ali al-Tai, the AQI "governor" of Mosul.

198.    But AQI/ISIS was particularly resilient in Ninawa Province because Abu Ghadiyah's vast foreign fighter facilitation network in Syria was being rebuilt (with the Syrian regime's support) under the leadership of Abu Khalaf, who helped transit AQI operatives (particularly from Tunisia) to Syria and then across the border into Mosul to perpetrate suicide attacks.

199.    Abu Khalaf was killed in January 2010.

## VII.   PLAINTIFFS

### 1.       THE APRIL 10, 2009 ATTACK – WESTERN MOSUL

**The Pautsch Family**

200.    Corporal Jason Pautsch was a citizen of the United States serving in the U.S. Army when he was killed in an AQI attack involving a Suicide Vehicle-Borne Improvised Explosive

---

[56]      The same pattern re-emerged in 2012 with ISIS launching waves of suicide bombings, using foreign volunteers transited through the same infiltration routes from Syria.

Device ("SVBIED") that also claimed the lives of four other U.S. service members.

201.    Corporal Pautsch and his fellow soldiers were on a reconnaissance patrol on the morning of April 10, 2009, in western Mosul, Iraq when they identified the threat posed by an oncoming dump truck and made every effort to prevent the vehicle from reaching its intended target, a nearby Army Headquarters.

202.    When the AQI operative detonated the truck bomb, the massive overpressure from the blast killed Corporal Pautsch and his fellow soldiers immediately.

203.    Plaintiff David Pautsch is a citizen of the United States and domiciled in the State of Iowa. He is the father of Jason Pautsch.

204.    Plaintiff Teri Johnson is a citizen of the United States and domiciled in the State of Illinois. She is the mother of Jason Pautsch.

205.    Plaintiff Jacob Pautsch is a citizen of the United States and domiciled in the State of Iowa. He is the brother of Jason Pautsch.

206.    As a result of the attack, and the death of Jason Pautsch, Plaintiffs David Pautsch Teri Johnson and Jacob Pautsch have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

## 2.    THE SEPTEMBER 24, 2004 ATTACK - FALLUJAH

**The Vriens Family**

207.    Plaintiff Thomas Vriens is a naturalized citizen of the United States and domiciled in the State of California.

208.     On September 24, 2004, Thomas Vriens, then 21, was serving in the U.S. Marines. Mr. Vriens was part of a convoy whose mission was to transport vehicles to Fallujah from the Al Asad Airbase.

209.     The lead of Mr. Vriens' convoy was attacked by an IED fashioned from a 155mm artillery shell that was detonated by an AQI operative via cell phone. The convoy was disabled for a few hours, after which another round hit the convoy toward the back, injuring Mr. Vriens, killing two service members, and injuring another service member who subsequently died of his wounds.

210.     Mr. Vriens' service-connected disability rating is 100%. As a result of the attack, Mr. Vriens has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), and he suffers from tinnitus and thoracic and lumbosacral strain.

211.     As a result of the attack, and the injuries he suffered, Mr. Vriens has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**3.      THE NOVEMBER 11, 2004 ATTACK - FALLUJAH**

**The Neuman Family**

212.     Plaintiff Brian Neuman is a citizen of the United States and domiciled in the State of Texas.

213.     On November 11, 2004, Brian Neuman, then 32, was serving in the U.S. military in Iraq.

214.     Mr. Neuman was driving in a Bradley vehicle in Fallujah, when the vehicle was struck by an IED.

215.     As a result of the attack, he lost his left arm.

216.     He was also hit by shrapnel in multiple areas of his body, including both of his thighs, his right hand, and his legs.

217.    The injuries to his right leg caused significant soft tissue damage.

218.    Mr. Neuman has undergone multiple surgeries, and has received rehabilitative treatment and observation for over eight months, in both in-patient and out-patient capacities.

219.    Mr. Neuman experiences severe pain that shoots through his arm and chest, as well as phantom limb pain.

220.    He has been diagnosed with PTSD and continues to experience nightmares, for which he has been prescribed sleep aids.

221.    As a result of the attack, and the injuries he suffered, Plaintiff Brian Neuman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

222.    Plaintiff Erika Neuman is a citizen of the United States and domiciled in the State of Texas. She is the wife of Brian Neuman.

223.    As a result of the attack, and the injuries Brian Neuman suffered, Plaintiff Erika Neuman has experienced severe mental anguish and extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

**4.    THE MARCH 9, 2005 ATTACK – BAGHDAD**

224.    On March 9, 2005, at about 6:00 a.m., an AQI suicide bomber, using a garbage truck as a detonation device, detonated a bomb at a security checkpoint near the Al-Sadeer Hotel in central Baghdad.

225.    The Al-Sadeer Hotel was used as housing for U.S. civilian government contractors and was the target of multiple bombings.

226.    The explosion blew out all of the hotel's windows and destroyed dozens of cars in the hotel's parking lot. It left a huge crater in the concrete.

227.    Aside from the suicide bomber, the attack reportedly killed one person and injured at least 22 others.

228.    On the day of the attack, AQI issued a communiqué claiming responsibility for the attack, saying: "they (the enemy) call it The Jews Hotel, since it is their safe fortress and their solid un-penetrated shield. But their fortresses did not make them free (of attacks) and their shields did not protect them."

**The Byars Family**

229.    Plaintiff Wallace Byars is a citizen of the United States and domiciled in the State of South Carolina.

230.    On March 9, 2005, Wallace Byars, then 39, was employed as a civilian government contractor with DynCorp International LLC in Iraq.

231.    Mr. Byars was awoken by the bomb when his bedroom door and windows were blown off of their frames. Dizzy and confused, he left his room to help the injured.

232.    Mr. Byars witnessed gruesome injuries, including a victim missing an eye. Blood and body parts were everywhere. A perfectly intact face lay on the floor, unattached to the rest of the body it belonged to.

233.    That night, Mr. Byars stood in the hotel's lobby trying to call his wife, when he heard gunfire. The hotel sustained heavy fire for a short time before it ceased.

234.    As a result of the attack, Mr. Byars suffered hearing loss and PTSD. To this day, his ears continue to ring, and he still feels pain in his left ear. He needs to sleep with a light on and always has his doors locked. He isolates from others. He also experiences Traumatic Brain Injury ("TBI") symptoms.

235.   As a result of the attack, and the injuries he suffered, Mr. Byars has experienced severe mental anguish and extreme emotional pain and suffering.

**The O'Malley Family**

236.   Plaintiff Dennis O'Malley is a citizen of the United States and domiciled in the State of Tennessee.

237.   On March 9, 2005, Dennis O'Malley, then 45, was employed as a civilian government contractor with DynCorp International LLC in Iraq.

238.   Mr. O'Malley was sitting in the hotel lobby when he heard massive amounts of gunfire, followed by an explosion which blew him off his chair.

239.   Mr. O'Malley was hit by flying furniture and glass. He sustained lacerations to the back of his head and left leg.

240.   That night, Mr. O'Malley heard heavy gunfire attacking the hotel while he was in his room.

241.   As a result of the attack, Mr. O'Malley has been diagnosed with PTSD, and he has suffered from nightmares and alcoholism.

242.   As a result of the attack, and the injuries he suffered, Mr. O'Malley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**The Vessell Family**

243.   Plaintiff Richard Vessell is a citizen of the United States and domiciled in the State of Texas.

244.   On March 9, 2005, Richard Vessell, then 32, was employed as a civilian government contractor with DynCorp International LLC in Iraq.

245.   Mr. Vessell was awoken when the bomb detonated and blew the door and window

of his hotel room off their frames. The force of the blast threw him off of his bed and onto the floor.

246.     Mr. Vessell left his room to help the injured.

247.     He still recalls the smoke, chaos, and gruesome injuries he observed.

248.     Mr. Vessell tries to avoid talking about what he saw that day because doing so causes him much pain.

249.     As a result of the attack, and the injuries he suffered, Mr. Vessell has experienced severe mental anguish and extreme emotional pain and suffering.

**5.     THE MAY 9, 2005 ATTACK - KHUTAYLAH**

**The Goldsmith Family**

250.     Plaintiff Jason Goldsmith is a citizen of the United States and domiciled in the State of North Carolina.

251.     On May 9, 2005, Jason Goldsmith, then 26, was serving in the U.S. Marines.

252.     Mr. Goldsmith was engaged in Operation Matador, a military offensive conducted from May 8-19, 2005, by the U.S. Marines against STGI positions in Iraq's northwestern Anbar Province.

253.     On May 9, 2005, Mr. Goldsmith's convoy was heading to Nasiriyah when it was attacked in a complex ambush initiated by rocket-propelled grenades ("RPGs") and small arms fire. Soon afterward, two IEDs detonated near the convoy, followed by two AQI SVBIEDs.

254.     As a result of the attack, Mr. Goldsmith sustained superficial burns to the right side of his face, shrapnel wounds, and a concussion. He suffers from PTSD, TBI, and tinnitus.

255.     Mr. Goldsmith has received a service-connected disability rating of 100%.

256.    As a result of the attack, and the injuries he suffered, Mr. Goldsmith has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**6.    THE JULY 25, 2005 ATTACK – BAGHDAD**

257.    On July 25, 2005, the Al-Sadeer Hotel in central Baghdad was attacked again at about 6:00 a.m. by an AQI suicide bomber using a car as a detonation device.

258.    Aside from the bomber, the bomb reportedly killed 12 people and injured at least 18 others.

259.    That same day, AQI claimed responsibility for the attack.

**The Byars Family**

260.    Plaintiff Wallace Byars is a citizen of the United States and domiciled in the State of South Carolina.

261.    On July 25, 2005, Wallace Byars, then 40, was employed as a civilian government contractor with DynCorp International LLC in Iraq.

262.    Mr. Byars was awoken by a flash and the window blowing out of its frame into his hotel room. He heard gunfire coming from multiple locations.

263.    Mr. Byars, who had also been injured in the previous attack on the Al-Sadeer Hotel on March 9, 2005, still suffers from hearing loss and ear pain and ringing, as well as PTSD.

264.    As a result of the attack, and the injuries he suffered, Mr. Byars has experienced severe mental anguish and extreme emotional pain and suffering.

**The O'Malley Family**

265.    Plaintiff Dennis O'Malley is a citizen of the United States and domiciled in the State of Tennessee.

266.    On July 25, 2005, Dennis O'Malley, then 45, was employed as a civilian government contractor with DynCorp International LLC in Iraq.

267.    Mr. O'Malley, who was also injured in the previous attack on the Al-Sadeer Hotel on March 9, 2005, has been diagnosed with PTSD and has suffered from nightmares and alcoholism.

268.    As a result of the attack, and the injuries he suffered, Mr. O'Malley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

7.    **THE AUGUST 13, 2007 ATTACK - TAJI**

**The Davis Family**

269.    Plaintiff James Davis is a citizen of the United States and domiciled in the State of Washington.

270.    On August 13, 2007, James Davis, then 26, was serving in the U.S. military in Iraq.

271.    Mr. Davis was the gunner in the lead M1117 Armored Security Vehicle in a convoy on Route Tampa when his vehicle drove over a hole that had been blown into the ground by a previous explosion. An IED that had been emplaced by AQI inside the hole detonated, injuring Mr. Davis.

272.    As a result of the attack, Mr. Davis continues to suffer from ringing in his ears to this day.

273.    He has also been diagnosed with anxiety, adjustment disorder, depression, and alcoholism.

274.    As a result of the attack, and the injuries he suffered, Mr. Davis has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**8.    THE SEPTEMBER 1, 2008 ATTACK – MOSUL**

**The Shaffer Family**

275.    Plaintiff Charles James Shaffer is a citizen of the United States and domiciled in the State of Illinois.

276.    On September 1, 2008, Charles James Shaffer, then 23, was serving in the U.S. military in Iraq.

277.    Mr. Shaffer was on routine patrol in Mosul when his vehicle was struck by an explosive device.

278.    As a result of the attack, he sustained injuries that included second degree burns to his face and hands, significant loss of blood, and damage to his right leg.

279.    The injuries necessitated an above-the-knee amputation of Mr. Shaffer's right leg.

280.    He was placed in a medically induced coma for four days.

281.    Mr. Shaffer received treatment in Walter Reed Hospital for close to two years.

282.    Initially, Mr. Shaffer underwent surgeries every few days, for weeks, to address infection, treat the amputation site, and attend to the remaining limb. Multiple procedures were also performed to address and repair the affected area.

283.    Mr. Shaffer has experienced phantom limb pain and sensations subsequent to his leg amputation.

284.    The second-degree burns to his face resulted in unsightly discoloration, requiring laser treatment.

285.    Mr. Shaffer has been diagnosed with PTSD and TBI and experiences memory loss. He has been prescribed medication to address the symptoms of these conditions and the emotional impact of the attack.

286.     Mr. Shaffer continues to experience pain and emotional distress daily, and he continues to receive treatment for his injuries.

287.     As a result of the attack, and the injuries he suffered, Charles James Shaffer has experienced severe physical and mental anguish and extreme emotional pain and suffering.

288.     Plaintiff Charles L. Shaffer, Jr. is a citizen of the United States and domiciled in the State of Illinois. He is the father of Charles James Shaffer.

289.     As a result of the attack, and the injuries Charles James Shaffer suffered, Plaintiff Charles L. Shaffer, Jr. has experienced severe mental anguish and extreme emotional pain and suffering, and loss of his son's society, companionship, comfort, advice, and counsel.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**AGAINST DEFENDANTS ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF ATTEMPTED EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c)**

290.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

291.     Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to terror operatives in Iraq who engaged in extrajudicial killing, attempted extrajudicial killing, torture and hostage taking, and who injured Plaintiffs.

292.     As a direct and proximate result of the willful, wrongful, and intentional acts of Defendants and their agents, Plaintiffs identified in the foregoing paragraphs were injured and

endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses.

293.    Plaintiffs' compensatory damages include, but not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses determined by the trier of fact.

294.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public, warranting an award of punitive damages against Defendants pursuant to 28 U.S.C. § 1605A(c).

## SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN WRONGFUL DEATH UNDER 28 U.S.C. § 1605A(c)

295.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

296.    The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)), to terror operatives in Iraq who engaged in the acts of extrajudicial killing, torture and/or hostage taking that caused the decedents' deaths.

297.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendants and their agents, the decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths.

298.    Defendants are therefore liable for the full measure of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates).

299.   Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public, warranting an award of punitive damages against Defendants pursuant to 28 U.S.C. § 1605A(c).

### THIRD CLAIM FOR RELIEF

**AGAINST DEFENDANTS ON BEHALF OF THE FAMILIES OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, ATTEMPTED EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING FOR LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c)**

300.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

301.    Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict severe emotional distress on Plaintiffs.

302.   The families of individuals identified in the foregoing paragraphs as injured or killed as a result of Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

303.   Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendants pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

(a)     Judgment for all Plaintiffs against Defendants for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium, in amounts to be determined at trial.

(b)     Judgment for Plaintiff Estates against Defendants for compensatory damages for wrongful death, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial.

(c)     Judgment for all Plaintiffs against Defendants for punitive damages in an amount to be determined at trial.

(d)     Prejudgment interest.

(e)     Plaintiffs' costs and expenses; and

(f)     Such other and further relief as the Court finds just and equitable.

Dated: December 31, 2020

By     /s/ Ari Ungar
       **OSEN LLC**
       Ari Ungar, Esq. (DC Bar No. NJ008)
       Aaron Schlanger, Esq. (DC Bar No. NJ007)
       Gary M. Osen, Esq. (DC Bar No. NJ009)
       Dina Gielchinsky, Esq. (DC Bar No. NJ011)
       Patrick Duprey, Esq. (DC Bar No. NJ029)
       2 University Plaza, Suite 402
       Hackensack, NJ 07601
       (201) 265-6400

**TURNER & ASSOCIATES, P.A.**
Tab Turner, Esq.
(pro hac vice motion to be filed)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**MOTLEY RICE, LLC**
Michael Elsner, Esq.
(pro hac vice motion to be filed)
John Eubanks, Esq.
(pro hac vice motion to be filed)
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, SC 29465
(843) 216-9000

Attorneys for Plaintiffs