UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

------------------------------------------------------------------------x

JACOB PAUTSCH, *et al.*,       :

            :

     Plaintiffs,     :   **Case No. 20-cv-03859 (JEB)**

            :

-against-          :

            :

ISLAMIC REPUBLIC OF IRAN, *et al.*,   :

            :

     Defendants.    :

            :

------------------------------------------------------------------------x

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
<u>SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.     PROCEDURAL HISTORY ........................................................................................ 1

II.    LEGAL STANDARD FOR DEFAULT JUDGMENT .......................................... 2

    a.    Plaintiffs' Burden of Proof ........................................................................... 2

    b.    Evidence ........................................................................................................ 3

III.   FINDINGS OF FACT .......................................................................................... 6

    a.    Overview of AQI ........................................................................................... 7

    b.    Attacks ........................................................................................................... 9

       1.    September 24, 2004, Attack in Fallujah ............................................. 10

       2.    November 11, 2004, Attack in Fallujah............................................. 11

       3.    March 9, 2005, Attack in Baghdad ..................................................... 11

       4.    July 25, 2005, Attack in Baghdad ....................................................... 12

       5.    May 9, 2005, Attack in Khutaylah....................................................... 12

       6.    September 1, 2008, Attack in Mosul ................................................... 13

       7.    August 13, 2007, Attack in Taji........................................................... 13

       8.    April 10, 2009, Attack in Mosul ......................................................... 14

IV.   CONCLUSIONS OF LAW.................................................................................. 14

    a.    Subject Matter Jurisdiction......................................................................... 14

       1.    Defendants were both designated State Sponsors of Terrorism at the time of the attacks, and continue to be designated as such. ......................................................... 15

       2.    Each attack victim was, at the time of the attacks, a U.S. national, member of the armed forces, or a U.S. government employee or contractor. ................................... 15

       3.    Plaintiffs' claims are predicated on Defendants' "material support" for acts of extrajudicial killings. ............................................................................................. 16

       4.    Defendants each provided material support or resources to AQI enabling it to carry out the attacks. ..................................................................................................... 19

i

i.      Iran provided material support to AQI.................................................... 20

ii.     Syria provided material support to AQI................................................. 26

iii.    Defendants' material support to AQI enabled it to commit the attacks................ 31

b.   Personal Jurisdiction........................................................................... 33

V.   THEORIES OF LIABILITY ............................................................... 34

VI.  CONCLUSION ................................................................................. 35

# **TABLE OF AUTHORITIES**

**Cases**

*Abedini v. Gov't of the Islamic Republic of Iran*,
   422 F. Supp. 3d 118 (D.D.C. 2019) ........................................................................ 35

*All v. Islamic Republic of Iran*,
   No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097 (D.D.C. June 27, 2023).... 10, 22

*Battles v. Islamic Republic of Iran*,
   No. 21-cv-179, 2022 U.S. Dist. LEXIS 149033 (S.D. Tex. Aug. 17, 2022)............................ 23

*Borochov v. Islamic Republic of Iran*,
   No. 22-cv-7058, 2023 U.S. App. LEXIS 1811 (D.C. Cir. Jan. 24, 2023)................................ 18

*Borochov v. Islamic Republic of Iran*,
   589 F. Supp. 3d 15 (D.D.C. 2022) .................................................................... 17, 18

*Braun v. Islamic Republic of Iran*,
   228 F. Supp. 3d 64 (D.D.C. 2017) ...................................................................... 33

*Brown v. Islamic Republic of Iran*,
   No. 21-cv-1308 (TNM), 2023 U.S. Dist. LEXIS 129612 (D.D.C. July 27, 2023) ............. 12, 22

*Cabrera v. Islamic Republic of Iran*,
   No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022).............. 10, 24

*Cabrera v. Islamic Republic of Iran*,
   No. 19-cv-3835 (JDB), 2023 U.S. Dist. LEXIS 14874 (D.D.C. Jan. 27, 2023) ...................... 18

*Campuzano v. Islamic Republic of Iran*,
   281 F. Supp. 2d 258 (D.D.C. 2003) ..................................................................... 2

*Cohen v. Islamic Republic of Iran*,
   238 F. Supp. 3d 71 (D.D.C. 2017) ...................................................................... 25

*Doe v. Syrian Arab Republic*,
   No. 18-cv-00066 (KBJ), 2020 U.S. Dist. LEXIS 167697 (D.D.C. July 27, 2020). 26, 27, 28, 29

*Espitia v. Islamic Republic of Iran*,
   No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841 (S.D. Tex. June 16, 2022) ................... 7, 8, 22

*Est. of Parhamovich v. Syrian Arab Republic*,
   No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282 (D.D.C. Dec. 28, 2022).............. *passim*

*Flanagan v. Islamic Republic of Iran*,
  190 F. Supp. 3d 138 (D.D.C. 2016) ...................................................... 4

*Flanagan v. Islamic Republic of Iran*,
  87 F. Supp. 3d 93 (D.D.C. 2015) ........................................................ 24

*Foley v. Syrian Arab Republic*,
  249 F. Supp. 3d 186 (D.D.C. 2017) ............................................... 21, 34

*Fritz v. Islamic Republic of Iran*,
  320 F. Supp. 3d 48 (D.D.C. 2018) ................................................. 4, 34

*Frost v. Islamic Republic of Iran*,
  383 F. Supp. 3d 33 (D.D.C. 2019) ...................................................... 3

*Gates v. Syrian Arab Republic*,
  580 F. Supp. 2d 53 (D.D.C. 2008) ............................................ 19, 27, 29

*Gill v. Islamic Republic of Iran*,
  249 F. Supp. 3d 88 (D.D.C. 2017) ..................................................... 17

*Han Kim v. Democratic People's Republic of Korea*,
  774 F.3d 1044 (D.C. Cir. 2014) ......................................................... 4

*Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*,
  No. 03-mdl-1570, 2011 U.S. Dist. LEXIS 155899 (S.D.N.Y. Dec. 22, 2011) ......... 24

*Herrick v. Republic*,
  No. 21-cv-168, 2022 U.S. Dist. LEXIS 148002 (S.D. Tex. Aug. 17, 2022)............ 23

*Karcher v. Islamic Republic of Iran*,
  396 F. Supp. 3d 12 (D.D.C. 2019) ................................................. 17, 25

*Karcher v. Islamic Republic of Iran*,
  No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170 (D.D.C. Jan. 14, 2021) ........... 9

*Lee v. Islamic Republic of Iran*,
  518 F. Supp. 3d 475 (D.D.C. 2021) ............................................... 18, 19

*Maupin v. Syrian Arab Republic*,
  No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS 237831 (D.D.C. Mar. 20, 2019)......... 26

*Mueller v. Syrian Arab Republic*,
  No. 18-cv-01229 (CJN), 2023 U.S. Dist. LEXIS 16233 (D.D.C. Jan. 31, 2023) ........ 26

*Neiberger v. Islamic Republic of Iran*,
  No. 16-cv-2193 (EGS) (ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sep. 26, 2022) .. 20, 21

*Neiberger v. Islamic Republic of Iran,*
   No. 16-cv-2193 (EGS) (ZMF), 2022 U.S. Dist. LEXIS 218169 (D.D.C. Sep. 8, 2022) .... 20, 21

*Opati v. Republic of Sudan,*
   140 S. Ct. 1601 (2020) ........................................................................................................ 3, 35

*Owens v. Republic of Sudan,*
   826 F. Supp. 2d 128 (D.D.C. 2011) ...................................................................................... 3, 24

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017) ...................................................................... 3, 4, 16, 31

*Pennington v. Islamic Republic of Iran,*
   No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022)........................ 35

*Pennington v. Islamic Republic of Iran,*
   No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529 (D.D.C. Jan. 19, 2022)........................... 35

*Roth v. Islamic Republic of Iran,*
   No. 19-cv-02179 (TNM), 2023 U.S. Dist. LEXIS 7803 (D.D.C. Jan. 17, 2023) ......... 10, 11, 22

*Rothstein v. UBS,*
   708 F.3d 82 (2d Cir. 2013)................................................................................................... 31

*Salzman v. Islamic Republic of Iran,*
   No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632 (D.D.C. Sep. 25, 2019)........................ 18

*Sotloff v. Syrian Arab Republic,*
   525 F. Supp. 3d 121 (D.D.C. 2021) ............................................................................... 26, 27

*Thuneibat v. Syrian Arab Republic,*
   167 F. Supp. 3d 22 (D.D.C. 2016) ........................................................ 27, 28, 29, 33

*Valore v. Islamic Republic of Iran,*
   700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................................... 3

*W.A. v. Islamic Republic of Iran,*
   427 F. Supp. 3d 117 (D.D.C. 2019) ............................................................................... 9

*Weinstein v. Islamic Republic of Iran,*
   184 F. Supp. 2d 13 (D.D.C. 2002) ............................................................................... 3

## Statutes

18 U.S.C. § 2339A(b)(1)......................................................................................................... 20

28 U.S.C. § 1330(b) ........................................................................................................ 33, 34

28 U.S.C. § 1605A..................................................................................................... *passim*

28 U.S.C. § 1605A(c) ........................................................................................... 31, 34, 35

28 U.S.C. § 1605A(h)(3) ................................................................................................ 20

28 U.S.C. § 1605A(h)(7) ................................................................................................ 16

28 U.S.C. § 1608(a) ....................................................................................................... 33

28 U.S.C. § 1608(a)(3) ............................................................................................... 2, 33

28 U.S.C. § 1608(a)(4) ............................................................................................... 2, 33

28 U.S.C. § 1608(d) ......................................................................................................... 2

28 U.S.C. § 1608(e) ...................................................................................................... 2, 3

Pub. L. No. 102–256, 106 Stat. 73 ............................................................................... 16

**Rules**

Fed. R. Evid. 703 ............................................................................................................. 4

This is a civil action brought pursuant to the Terrorism Exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. Plaintiffs are victims of eight terrorist attacks which were perpetrated in Iraq between 2004-2009, and their family members. As described in further detail below, the terrorist group responsible for each of these terrorist attacks is the U.S.-designated Foreign Terrorist Organization ("FTO") Al Qaeda in Iraq ("AQI") or another Sunni terrorist group in Iraq ("STGI") associated with or dominated by AQI, all of which were materially supported by Defendants the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria").

Plaintiffs respectfully move this Court to enter default judgment against Defendants based on the material support and resources they provided to AQI and associated STGIs, which enabled them to commit the attacks. In support of their proposed findings of fact and conclusions of law, Plaintiffs proffer the sworn expert report of Colonel (Ret.) Joel Rayburn (the "Rayburn Report" or "Rayburn Rep."), attached as **<u>Exhibit A</u>**. Col. Rayburn has held several government posts that are highly relevant to the subject of this lawsuit. He is also the co-author of the two-volume Department of Defense history of the conflict in Iraq between 2003 and 2011. Plaintiffs also request that the Court take judicial notice of the findings and factual records in the many decisions both in and outside of this District described herein that have awarded default judgement against Defendants for their material support to AQI and its associated STGIs.

## I.     PROCEDURAL HISTORY

Plaintiffs filed their Complaint against Defendants on December 31, 2020. ECF No. 1. On February 12, 2021, Plaintiffs filed with the Court affidavits requesting foreign mailings of the Summons, Complaint, and Notice of Suit, along with a translation of each into Arabic for Syria and Farsi for Iran, upon both Defendants. ECF Nos. 8, 9.

On February 23, 2021, pursuant to 28 U.S.C. § 1608(a)(3), the Clerk of the Court certified that process was mailed by registered mail. ECF No. 11. Both Defendants refused delivery, and on March 15 and 31, 2021 (Syria) and August 25, 2021 (Iran), the service packages were returned to the Court unexecuted. ECF Nos. 13 and 15.

Plaintiffs then attempted service of process on Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). On November 15, 2021, Plaintiffs made a request to the Clerk of the Court by letter to assist in transmitting the service documents. ECF No. 17. The Clerk of the Court transmitted the service documents to the State Department that same day via FedEx. ECF No. 18. The documents were successfully transmitted to Iran and Syria respectively on June 15, 2022, and June 23, 2022, under cover of diplomatic note. ECF Nos. 21 and 22.

Pursuant to 28 U.S.C. § 1608(d), each Defendant's time to file an answer or other responsive pleading expired 60 days later, and on September 2, 2022, Plaintiffs filed affidavits in support of default against Defendants. ECF Nos. 23 and 24. On September 8, 2022, the Clerk's office issued defaults as to each Defendant. ECF Nos. 25 and 26. Plaintiffs now move for default judgment.

## II.     LEGAL STANDARD FOR DEFAULT JUDGMENT

### a.     Plaintiffs' Burden of Proof

When default is sought under the FSIA, Plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (internal citations and quotation marks omitted).

"In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). *See also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (holding that this standard may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence") (internal citations and quotations omitted). Notably, the D.C. Circuit emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted), *vacated on other grounds sub nom.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 44 (D.D.C. 2019) (internal citations and quotations omitted). The D.C. Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens*, 864 F.3d at 785.

### b.     Evidence

In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Owens*, 864 F.3d at 785 (citing *Han Kim v.*

*Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014)) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding).

A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Id.* (internal citations and quotations omitted). In sum, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id.* at 785-86.

Moreover, plaintiffs in FSIA cases frequently rely on expert testimony rather than primary evidence. As noted above, courts in this District "[r]ecogniz[e] that expert testimony is not only proper, but often sufficient, and even indispensable in 'terrorism cases … because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787). Experts, in turn, may rely on evidence that might not otherwise be admissible in forming their opinions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). *See also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016) ("[I]n the terrorism context, experts' reliance on hearsay evidence is often critical.").

Accordingly, Plaintiffs proffer the sworn expert report of Colonel Joel Rayburn (Ret.), attached as **Exhibit A**. The consolidated appendix of records relied upon by Col. Rayburn in

assessing that AQI or its associated STGIs perpetrated the attacks in this case is filed as **Exhibit B** under seal.

As reflected in his curriculum vitae appended to his report, Col. Rayburn has decades of experience relating to the conflict in Iraq, and the roles Iran and Syria played in it. From July 2018 to January 2021, Col. Rayburn was the U.S. Special Envoy for Syria. In that post, he oversaw U.S. diplomatic activities concerning Syria, supervised more than 100 diplomats and civil servants across the Middle East and Europe, and, from November 2020 to January 2021, served as U.S. chief of mission for Syria. Until November 2020, Col. Rayburn was also Deputy Assistant Secretary for Levant Affairs, responsible for implementing U.S. policy concerning Syria, Jordan, and Lebanon.

Before joining the State Department, Col. Rayburn served 26 years as a U.S. Army officer, with his final assignment as senior director for Iran, Iraq, Syria, and Lebanon on the National Security Council staff in 2017-2018. Commissioned from West Point in 1992, Col. Rayburn served in assignments in Europe, the Middle East, South Asia, and the United States, including several deployments to Iraq, Afghanistan, and Bosnia. As a field artillery officer, Col. Rayburn served in the 1st Armored Division from 1993-1996, during which he deployed to Kuwait as part of Operation Intrinsic Action and to Bosnia-Herzegovina as part of NATO's Implementation Force. He also served as a Balkans intelligence analyst at the EUCOM Joint Analysis Center at Royal Air Force (RAF) Molesworth in 1999-2000. Col. Rayburn then taught history at West Point from 2002-2005 and served as an advisor to General John Abizaid at U.S. Central Command (the Department of Defense's combatant command responsible for the Middle East) from 2005 to 2007. In 2007, he served on the Joint Strategic Assessment Team assembled by General David Petraeus and Ambassador Ryan Crocker in Baghdad.

From 2008 to 2011, he was a strategic intelligence advisor to General Petraeus in Iraq, Afghanistan, and the Persian Gulf region, with a focus on the activities and plans of the IRGC-Qods Force, Lebanese Hezbollah, and the Assad regime, as well as on the major Sunni terrorist groups active in the northern Middle East. From 2011 to 2012, Col. Rayburn was a senior military fellow at the Institute of National Strategic Studies. From 2013 to 2016, Col. Rayburn directed the Army's Operation Iraqi Freedom Study Group, where he led the writing of the Army's official history of the Iraq war and assembled operational lessons to be drawn from the conflict. In 2018, the group's work was published in the two-volume study *The U.S. Army in the Iraq War*, for which Col. Rayburn was co-author and editor. He holds an MA in History from Texas A&M University and an MS in Strategic Studies from the National War College.

He is the founder and director of the American Center for Levant Studies, a non-profit research organization that focuses on Middle East affairs. He is also a research scholar focusing on Middle East issues at the New America Foundation and the Hoover Institution. Previously, he served as Special Advisor for Middle East Affairs in the office of Senator Bill Hagerty (R-TN), assisting Senator Hagerty in foreign relations and national security affairs from January to July 2021.

In his report, Col. Rayburn describes his conclusions that AQI, or another STGI associated with AQI or dominated by it, was responsible for each of the attacks in this case, and that Defendants each provided material support to AQI or the STGI which enabled it to perpetrate the attacks.

## III.    FINDINGS OF FACT

Plaintiffs proffer the following findings of fact reflected in the Rayburn Report and decisions granting default judgment against Defendants for their material support to AQI and

associated STGIs, of which this Court may take judicial notice.

### a.   Overview of AQI

After the United States invaded Afghanistan shortly after the September 11, 2001, attacks, Iran provided safe haven to several Al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist. *See* Rayburn Rep. at 18-21. *See also Espitia v. Islamic Republic of Iran*, No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841, at *4 (S.D. Tex. June 16, 2022) (finding these facts sufficiently established).

Zarqawi originally operated under the protection of Iran's Islamic Revolutionary Guard Corps ("IRGC") – Iran's special armed forces charged with defending its revolutionary regime, as opposed to its conventional military – and the IRGC's elite Qods Force ("IRGC-QF"), the IRGC's external operations force (the IRGC and IRGC-QF are designated FTOs[1]). *See* Rayburn Rep. at 19, 22-25. *See also Espitia*, 2022 U.S. Dist. LEXIS 108841, at *4-5 (finding same). The time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. *See id.* at *5. He was permitted by Iran to move back and forth across the Iran-Iraq border in 2001-2002 before settling in Iraq, where he became a leader of Sunni extremists and insurgent groups. *See* Rayburn Rep. at 21; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5 (finding same).

Zarqawi consolidated those groups with his pre-existing terrorist group—Jamaat Tawhid wa al-Jihad ("JTJ"). *See* Rayburn Rep. at 12, 21; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5. On October 17, 2004, he swore allegiance to Osama bin Laden and Al Qaeda and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as Al Qaeda in Iraq, or AQI. *See* Rayburn Rep. at 12, 21; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5. Zarqawi served as the leader of AQI until his death in a U.S. military airstrike in June 2006. *See* Rayburn

---

[1]     Fact Sheet, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019), *available at* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

Rep. at 12, 27.

AQI was the first Al Qaeda affiliate to be designated as an FTO by the United States. *See* Rayburn Rep. at 21 n.18. Initially, JTJ was designated as an FTO by the U.S. Department of State on October 15, 2004. *See id.* (citing Press Statement, U.S. Dep't of State, "Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases" (Oct. 15, 2004)). In making this FTO designation, the State Department cited Zarqawi and JTJ's abduction and execution of American citizens as well as its campaign to foment civil war in Iraq. *See id.* On December 17, 2004, the State Department amended this FTO designation to reflect the fact that Zarqawi and JTJ had publicly declared their allegiance to Osama bin Laden and Al Qaeda in October 2004 and renamed themselves Al Qaeda in Iraq. *See id.* (citing Press Statement, U.S. Dep't of State, "Addition of Al-Manar to the Terrorist Exclusion List" (Dec. 28, 2004)). In this amendment, the State Department noted that Zarqawi and AQI had claimed responsibility for attacks against U.S. forces in Iraq as well as for numerous other terrorist attacks. *See id.*

The U.S. invaded Iraq in March 2003, and completed major combat operations and removed the Saddam Hussein regime by May. AQI presented a very serious threat to the post-2003 stability of Iraq, and combating AQI attacks was a focus for the U.S. military in the early years of the Iraqi conflict. *See Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5 (citing expert report). According to a counterterrorism expert in that case, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." *Id.* (citing expert report) (internal quotation marks omitted). The STGIs, including AQI, focused their activity in western and northern Iraq and Baghdad. *See id.* In other regions (and times), terrorist groups associated with Iraq's Shi'a majority (which groups were also backed by Iran and were aimed at attacking U.S. forces), predominated. *See* Rayburn Rep. at 4-5. *See also W.A. v.*

*Islamic Republic of Iran*, 427 F. Supp. 3d 117, 125 (D.D.C. 2019) (referring to the "Shia South of Iraq") (citing Col. Rayburn's expert report); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170, at *207 (D.D.C. Jan. 14, 2021) (finding that a 2009 attack in the southern city of Basra using an explosively formed penetrator was committed by a Shi'a "Special Group" because, *inter alia*, the military record from the attack "indicates that Special Groups had increased freedom of movement in the region wherein the May 16, 2009 attack occurred").

As explained below, the primary terrorist groups operating in Iraq were Sunni groups associated with AQI and Shi'a groups openly associated with Iran—but both sets of terrorist groups received assistance from Iran and Syria. *See* Rayburn Rep. at 21-22, 24-25, 31. As described in Section IV.a.4(i) and (ii), each Defendant provided material support to AQI and other STGIs to achieve its own objectives, including Iran's goal of "harming the interests of the United States and its allies in the Middle East," Rayburn Rep. at 15-16, and "prevent[ing] the United States and its allies from establishing a friendly government in Iraq or from stabilizing the country on terms favorable to the United States." *Id.* at 21. Similarly, Syria's provision of material support was incentivized by its "its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq," *id.* at 30, as well as to "actively channel Syrian Sunni extremists' activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 31.

**b.    Attacks**

Plaintiffs were serving in Iraq as U.S. service members or military contractors when they were injured or killed in attacks which took place between 2004-2009. Col. Rayburn assessed each attack and determined that they were perpetrated by AQI, or an STGI associated with or dominated

by AQI.

In doing so, he relied on five types of evidence which can help attribute an attack to AQI or an associated STGI with a high degree of confidence. Evidence in these categories can be cross-referenced to support a finding of attribution, and not all are necessary to do so. These are:

1. Reliable claims of responsibility;

2. Investigative findings by government agencies;

3. The area of the attack;

4. The date of the attack; and

5. The tactics, techniques, and procedures ("TTP") of the attack.

*See id.* at 3.

Courts have credited these methods in other cases, including as to AQI attacks. *See, e.g.*, *Roth v. Islamic Republic of Iran*, No. 19-cv-02179 (TNM), 2023 U.S. Dist. LEXIS 7803, *22 (D.D.C. Jan. 17, 2023) ("Therefore, based on the time, types of weapons, sophistication of the attack, and the group controlling the region, [the plaintiffs' expert] concluded that only AQI could have been responsible."). *See also All v. Islamic Republic of Iran*, No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097, *12 (D.D.C. June 27, 2023) (same relating to AQI attacks); *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290, *46-47 (D.D.C. July 19, 2022) (crediting expert attribution premised on the Taliban's "TTPs" and role as the "main group" in the area).

### 1.      September 24, 2004, Attack in Fallujah

On September 24, 2004, then-Lance Corporal ("Lcpl.") Thomas Vriens was injured in an improvised explosive device ("IED") attack on his convoy near Fallujah. At the time, Lcpl. Vriens's Marine unit was deployed to the Fallujah area to take part in counterinsurgency operations leading up to the November-December 2004 Operation Phantom Fury, the U.S.-led Coalition

operation to retake Fallujah and its surrounding area from JTJ. *See* Rayburn Rep. at 41-42. Col. Rayburn determined that it was "highly unlikely" that a terrorist group not associated with Zarqawi and AQI (which JTJ became known as just weeks after this attack) conducted the attack, based on four factors: (i) "At the time of the attack, Zarqawi's forces were the overwhelmingly dominant insurgent group operating in the Fallujah area"; (ii) "all of the insurgent groups in that area at that time were either part of Zarqawi's organization or were operating in close coordination with it"; (iii) "IED attacks against U.S. military convoys were the preferred tactic of Zarqawi's forces at that time"; and (iv) "there were virtually no Shia militant forces operating in or near Fallujah at that time." *Id.* at 42. *See also Roth*, 2023 U.S. Dist. LEXIS 7803, at *29 ("Indeed, [the plaintiffs' expert] described the IED as AQI's 'preferred tactic.'") (citing expert report).

### 2.      November 11, 2004, Attack in Fallujah

On November 11, 2004, then-Sergeant ("Sgt.") Brian Neuman was in a dismounted patrol taking part in combat operations in the Fallujah area when he and his patrol were struck by an IED. *See* Rayburn Rep. at 43. Sgt. Neuman's unit was also taking part in Operation Phantom Fury. *See id.* Col. Rayburn determined that it was "highly likely" that this attack was conducted by AQI or an associated STGI for the same reasons he cited with regard to his conclusions in the September 24, 2004, attack: AQI was in control of virtually all of the insurgent groups operating in Fallujah at that time, and IEDs were the preferred AQI tactic in Fallujah. *See id.* at 43. Additionally, the location of the IED attack was approximately three hundred meters from a mosque, and "throughout the operations in Fallujah, AQI and its associated groups used Fallujah's mosques as bases for their attacks and operations." *Id.*

### 3.      March 9, 2005, Attack in Baghdad

Military contractors Wallace Byars, Dennis O'Malley, and Richard Vessell were injured in a suicide vehicle-borne improvised explosive device ("SVBIED") attack in Baghdad, Iraq—that

is, a vehicle loaded with explosives, driven up to its target, and detonated. The SVBIED attack targeted the Iraqi Ministry of Agriculture and the adjacent al-Sadeer Hotel, which housed the military contractors who supported the operations of the Ministry of Agriculture. *See id.* at 43-44. Col. Rayburn determined that AQI perpetrated the attack, noting that the FTO "issued multiple statements on 9 March 2005 claiming responsibility for the attack," and that the attack bore "hallmarks of AQI's tactics at that time," specifying that the attack was "an early part of Zarqawi and AQI's spring 2005 car bomb offensive against the newly elected transitional government of Iraq." *Id.* at 44. *See also Brown v. Islamic Republic of Iran*, No. 21-cv-1308 (TNM), 2023 U.S. Dist. LEXIS 129612, at *12 (D.D.C. July 27, 2023) ("The VBIED is one of AQI's signature attack methods.") (citing expert report).

### 4.    July 25, 2005, Attack in Baghdad

Messrs. Byars and O'Malley were injured in a second SVBIED attack that also targeted the al-Sadeer hotel on July 25, 2005. Col. Rayburn determined that this attack was also conducted by AQI, as AQI claimed responsibility for the attack, and the "SVBIED attack was typical of AQI's car bomb tactics and took place during the course of AQI's car bomb offensive against the new Iraqi transitional government." *Id.* at 45.

### 5.    May 9, 2005, Attack in Khutaylah

On May 9, 2005, then-Corporal ("Cpl.") Jason Goldsmith was wounded during a complex attack (deploying small arms fire, rocket-propelled grenades, IEDs, and SVBIEDs) on his military convoy near Khutaylah. Cpl. Goldsmith's Marine unit was part of the Coalition's Operation Matador, a military offensive against insurgent positions in Iraq's Anbar Province which ran from May 8-19, 2005. *See id.* at 45. Col. Rayburn determined that it was "highly likely" that this attack was "part of AQI's operations against the Coalition units executing Operation Matador," and that the likelihood that the attack was conducted by a non-AQI-associated group is "virtually zero." *Id.*

at 46. Specifically, Col. Rayburn noted the area of the western Anbar Province in which the attack took place, which was "dominated" by AQI at that time, and AQI's fight to "expand its control of the local area and to counter the Coalition's Operation Matador." *Id.*

### 6.      September 1, 2008, Attack in Mosul

On September 1, 2008, then-Private Second Class ("PV2") Charles Shaffer was wounded in a rocket-propelled grenade attack against his vehicle in Mosul. *See id.* at 46. Col. Rayburn determined that the likelihood that a non-AQI-associated militant group could have conducted this attack is "virtually zero," explaining that "[v]irtually all the other Sunni groups in [the] Mosul area had either joined the 'Awakening' movement and become allies of the Coalition or had been subsumed into AQI itself by that time." *Id.* at 47. The "Awakening" movement was initiated by local Iraqi Sunni tribal militias that had formerly been willing to cooperate with, or at least tolerate, AQI, until the fall of 2006. The shift was prompted by these militias' newfound resistance to AQI's heavy-handed treatment of Sunni communities in northern and western Iraq. These militias began to join forces with U.S. troops and Iraqi security forces against AQI. *See id.* at 38.

Col. Rayburn also cited his own personal experience traveling to Mosul and observing the extent of AQI's domination over the area at that time. *See id.* at 46-47. Additionally, the use of the rocket-propelled grenades specifically was a "hallmark" of AQI's tactics at that time, as "AQI militants had found it more difficult to use IEDs against Coalition units and therefore began using Russian-made RKG-3 armor-piercing grenades as a common tactic." *Id.* at 47. Finally, Col. Rayburn opined that the attack most likely reflected AQI's attempts to combat the U.S.-Iraqi combined Operation Defeat Al Qaeda in the North ("OPDAN"). *Id.*

### 7.      August 13, 2007, Attack in Taji

On August 13, 2007, then-Specialist ("Spc.") James Davis was injured in an IED attack against his unit near Taji. *See id.* Col. Rayburn determined that the attack was "likely conducted

by AQI or an STGI associated with AQI," *id.*, citing the use of an IED (a preferred tactic by AQI), the location of the attack, of which Col. Rayburn has personal experience observing the extent of AQI's "consolidation of control over Sunni militant groups and operations by that time," and the timing of the attack, which followed the "Awakening," "making it highly unlikely that a non-AQI Sunni militant group would have conducted the attack." *Id.* at 48.

### 8.      April 10, 2009, Attack in Mosul

On April 10, 2009, Corporal ("Cpl.") Jason Pautsch was killed in an SVBIED attack in Mosul. *See id.* at 48. The SVBIED vehicle was driven by a "Tunisian jihadist who had been recruited by an AQI facilitation network based in Syria and Iraq, with key logistical and planning activities conducted by an Iraqi-born Canadian citizen named Faruq Khalil Muhammad Isa." *Id.* at 49. Isa was later convicted of planning this attack in the District Court for the Eastern District of New York and sentenced in 2019 to 26 years in prison for this act. *See id.* In determining that the attack was conducted by AQI, Col. Rayburn referenced the "extensive evidence cited in the prosecution of Isa" which confirmed that Isa was one of AQI's "key facilitators who planned to reestablish their suicide attack facilitation network in Mosul in particular." *Id.* at 50. In addition, Col. Rayburn noted that the SVBIED used in the attack was a dump truck containing as much as 10,000 lbs. of explosive material, "typical of AQI SVBIED attacks in 2008-2009." *See id. See also id.* at 6 ("The IEDs that AQI and STGIs employed were less effective in penetrating U.S. armored vehicles than EFPs [explosively formed penetrators, the signature weapons of Shi'a terrorist groups] were, but AQI and STGIs made up for that deficiency through sheer size of explosives.").

## IV.     CONCLUSIONS OF LAW

### a.      Subject Matter Jurisdiction

The FSIA's Terrorism Exception confers jurisdiction against a foreign government if: (1) the claims are against a designated "State Sponsor of Terrorism"; (2) the "claimant or the victim"

was, at the time of the attack, "a national of the United States," "a member of the armed forces," or a U.S. government employee or contractor; (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of such acts; and (4) the act, "or the provision of material support or resources for the act" is "engaged in by an official, employee, or agent of the foreign state." 28 U.S.C. §1605A(a)(1)–(2).[2]

1.     **Defendants were both designated State Sponsors of Terrorism at the time of the attacks, and continue to be designated as such.**

Regarding the first element, the Court may take judicial notice of each of Iran's and Syria's status as a designated State Sponsor of Terrorism, both when the cause of action arose and now. The State Department designated Iran a State Sponsor of Terrorism on January 19, 1984, and it has retained its designation continuously since then. *See* U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm. Syria has been designated a State Sponsor of Terrorism continuously since December 29, 1979. *See id.*

2.     **Each attack victim was, at the time of the attacks, a U.S. national, member of the armed forces, or a U.S. government employee or contractor.**

Plaintiffs fulfill the second element, as reflected by the "Section 1605A(a)(2)(A)(ii) Appendix" filed under seal as **Exhibit C**. This Appendix provides two types of information. First, it shows that a victim in each attack meets the requirements of § 1605A(a)(2)(A)(ii): namely, that each "was, at the time the [attack] occurred—(I) a national of the United States [or] (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment." It also provides information showing that the "personal

---

[2]     Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran or Syria.

injury or death" of each "was caused by an act of … extrajudicial killing." 28 U.S.C. § 1605A(a)(1). The Section 1605A(a)(2)(A)(ii) Appendix is organized according to the order of the attacks in the Complaint. It provides the name of each relevant victim in each attack and a copy of the U.S. military investigative or casualty report, medical record, or declaration separately identifying each victim and referencing the cause of injury/death.

### 3. Plaintiffs' claims are predicated on Defendants' "material support" for acts of extrajudicial killings.

The FSIA's Terrorism Exception permits liability against designated State Sponsors of Terrorism for "the provision of material support or resources" for "act[s] … of extrajudicial killing." 28 U.S.C. § 1605A(a)(1). Both Defendants in this case provided material support for "act[s] of … extrajudicial killing" that resulted in Plaintiffs' deaths or injuries. *Id.* "Extrajudicial killing" is defined by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extra-judicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73. "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 825.

Each of the attacks satisfies this definition. In one of the attacks, Cpl. Pautsch was killed. *See* Ex. B, Ex. 1 (Apr. 10, 2009, attack), p. 108 of the pdf (Casualty Report reflecting Cpl. Pautsch's death). The attack records reflect victims' deaths in three others. *See id.*, Ex. 2 (Sept. 24, 2004, attack) at p. 120 of the pdf ("1X USMC WIA AIR EVACED TO CAMP TQ AN[D] DIED OF WOUNDS"); *id.*, Ex. 4 (March 9, 2005, attack) at p. 142 of the pdf ("CURRENT BDA IS 1X IPS [Iraqi Police].); *id.*, Ex. 6 (July 25, 2005, attack) at p. 164 of the pdf ("SECURITY ELEMENT

CONFIRMS 6 CIVS KILLED"). In a fifth attack, the suicide bomber died. *See id.*, Ex. 5 (May 9, 2005, attack) at p. 153 of the pdf ("BDA: 5X FC WIA (4X URGENT, 1X PRIORITY), 2X AIF [anti-Iraqi forces, presumably the suicide bombers] KIA"). Although three of the attacks were not reported to have resulted in a victim's death (the November 11, 2004, attack, August 13, 2007, attack and September 1, 2008, attack), a death is not required because the definition of extrajudicial killing has been almost uniformly interpreted to "allow[] plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017). Any "deliberated" attempts to kill, regardless of whether they actually result in deaths, typically "fall within the scope of Section 1605A(a)(1)." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019).

The courts in *Karcher* and *Borochov v. Islamic Republic of Iran* further explained that it is the provision of material support for the *purpose* of an extrajudicial killing, not the death itself, that matters. "The FSIA waives sovereign immunity for injuries caused by 'material support *for*' an extrajudicial killing," and "[t]he word 'for' matters." 589 F. Supp. 3d 15, 32 (D.D.C. 2022) (citing 28 U.S.C. § 1605A(a)(1) (emphasis in *Borochov*). The dictionary definition of "for" "indicate[s] the object or purpose of an action or activity." *Id.* (citing dictionary) (internal quotation marks omitted). Accordingly, "[o]ne dresses 'for' dinner or studies 'for' an exam even if the dinner or exam never occurs"; therefore, "a foreign state's support with the object or purpose of an extrajudicial killing constitutes support 'for such an act' under the statute." *Id.* (citing 28 U.S.C. § 1605A(a)(1)). This issue of whether the statute requires that a death occur in order for a court to have subject matter jurisdiction over claims predicated on material support to extrajudicial killings where no person perished is presently before the Court of Appeals for the District of Columbia in

*Borochov v. Islamic Republic of Iran*, where oral argument is scheduled for September 29, 2023.[3]

"Next, the court must determine whether the killings were 'deliberated,'" which "is simply one undertaken with careful consideration, not on a sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (citing *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632, at *41 (D.D.C. Sep. 25, 2019)). The Rayburn Report details how the attacks at issue were part of a deliberate campaign of attacks against U.S. and Coalition personnel in Iraq, perpetrated by AQI and its associated STGIs and supported by Defendants. *See* Rayburn Rep. at 7 ("The Iranian government knowingly and as a matter of state policy provided material support to Al Qaeda, Al Qaeda in Iraq (AQI), and other Sunni terrorist groups in Iraq (STGIs) to carry out attacks against U.S. troops and civilians during the U.S.-led Coalition military campaign in Iraq from 2003 to 2011."); 9 (same with Syrian government). *See also id. at* 42 (determining that the September 24, 2004, attack was aimed at countering Operation Phantom Fury), 43 (determining that the November 11, 2004, attack was aimed at countering Operation Phantom Fury), 43-44 (determining that the March 9, 2005, attack was aimed at a hotel housing U.S. military contractors), 45 (determining that the July 25, 2005, attack was aimed at a hotel housing U.S. military contractors), 46 (determining that the May 9, 2005, attack was aimed at countering the Coalition's Operation Matador), 47 (determining that the September 1, 2008, attack was aimed at countering the U.S.-Iraqi combined Operation Defeat Al Qaeda in the North), 49 (determining that the April 10, 2009, attack was part of AQI's "ramped up" campaign of suicide

---

[3] While "most judges in this District who have considered this issue have determined that the material-support prong of the FSIA's terrorism exception extends to attempted extrajudicial killings," "two judges have recently reached the opposite conclusion after engaging in a close statutory review." *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2023 U.S. Dist. LEXIS 14874, at *21 (D.D.C. Jan. 27, 2023). The court in *Borochov v. Islamic Republic of Iran*, No. 19-cv-2855 (TNM), having previously held that an extrajudicial killing does not require a death, 589 F. Supp. 3d 15, 32-33, appointed *amicus curiae* to present argument on this issue during an appeal by the plaintiffs in that case of an unrelated issue, which is pending. *See Borochov*, No. 22-cv-7058, 2023 U.S. App. LEXIS 1811 (D.C. Cir. Jan. 24, 2023).

attacks in the aftermath of a U.S. military operation that killed its most prominent Syrian-based terrorist facilitator). Furthermore, each attack bore the hallmarks of AQI's tactics, including the group's use of IEDs, *see id.* at 35-42 (Sept. 24, 2004, attack), 43 (Nov. 11, 2004, attack), 45 (May 9, 2005, attack), 48 (Aug. 13, 2007, attack; SVBIEDs, *see id.* at 44 (March 9, 2005, attack), 45 (July 25, 2005, attack), 45-46 (May 9, 2005, attack), 49 (April 10, 2009, attack), and rocket-propelled grenades, *see id.* at 47 (Sept. 1, 2008, attack), and took place in areas dominated by AQI, *see id.* at 42 (Sept. 24, 2004, attack), 43 (Nov. 11, 2004, attack), 46 (May 9, 2005, attack), 46 (Sept. 1, 2008, attack), 48 (Aug. 13, 2007, attack), 50 (Apr. 10, 2009, attack). AQI claimed responsibility for the two implicated attacks on the al-Sadeer hotel, which housed U.S. military contractors. *See id.* at 44-45 (March 9, 2005, and July 25, 2005, attacks).

"Finally, there is no evidence that would suggest that the killings and attempted killings … were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation." *Lee*, 518 F. Supp. 3d at 492. The attacks therefore comprise acts of "extrajudicial killings" under the FSIA.

### 4. Defendants each provided material support or resources to AQI enabling it to carry out the attacks.

To establish this element, "courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282, at *10 (D.D.C. Dec. 28, 2022) (citing *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008)).

The Rayburn Report establishes the first consideration by concluding that each of the attacks was perpetrated by AQI, or an STGI associated with or dominated by AQI. *See* Rayburn

Rep. at 41-50.

With respect to the second consideration, material support or resources is defined under the FSIA as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). *See also* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18"). Evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, but "successful showings have generally focused on the foreign state's offer of haven to the terrorist group, provision of financing and weapons, assistance with recruitment, or motive to foment unrest in a particular area where the group is operating." *Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at *11 (internal citation and quotation marks omitted).

### i.       Iran provided material support to AQI.

Courts in and outside of this District have held that Iran provided such material support and resources to AQI (including during the relevant period) which allowed it to perpetrate terrorist attacks against U.S. service members and civilians in Iraq.

For example, the court in *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS) (ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sep. 26, 2022), adopted a report and recommendation which described how "Iran had contact with the Zarqawi organization, and was willing to provide financial support, logistical assistance, weaponry, and safe haven to the Zarqawi organization for its campaign of violence between 2003 and 2010." 2022 U.S. Dist. LEXIS 218169, *20-21 (D.D.C. Sep. 8, 2022) *adopted by* 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sept.

26, 2002). Specifically, the court agreed that "Iran provided safe haven to Zarqawi and its leaders by 'permit[ting] Zarqawi recruits to transit Iranian territory and make use of safe houses in different parts of the country,'" and that "Iran coordinated to provide funding and weapons to Zarqawi/AQI." *Id.* at *21 (citing expert report). The court adopted the expert's conclusion that AQI was responsible for the 2007 terrorist attack that killed a U.S. service member serving in Iraq and granted default judgment against Iran for providing it material support. *See id.* at *21-23.

The court in *Parhamovich* made the same findings when granting default judgment against Iran for the 2007 death of a U.S. civilian who traveled to Iraq to support its transition to democracy. *See* 2022 U.S. Dist. LEXIS 234282, at *2. The plaintiffs in that case relied on two expert declarations, which in turn relied on open source reporting, U.S. government-published records, and other relevant scholarship, to contend that "Iran provided material support and resources to [AQI successor-organization] ISI,[4] including 'weapons, money, safe haven, popular support and senior leader guidance[,]' both prior to and at the time of the attack that led to Ms. Parhamovich's death." *Id.* at *12 (record citations omitted). The court found the "evidence that the Islamic Republic provided material support to the Zarqawi organization during the relevant time period more than sufficient at the default stage." *Id.* at *19. Numerous other courts in this District have

---

[4]     The *Parhamovich* court noted that AQI was known as JTJ prior to September 2004, and ISI (the Islamic State in Iraq) after June 2006, and agreed with the conclusion by the expert in that case that those name changes did not reflect a change in AQI's ideology, strategy, or organization. *See Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at *13-14 ("Having reviewed that evidence, the Court agrees with his conclusion that 'at no point should the name changes be understood as signaling that the ... organization had become a truly new organization with discontinuity from what came before.' Whatever its name—ISI, AQI, JTJ, or Jund al-Sham—the organization's roots date back to the 1990s and '[t]he central node of [its] deeper history was the activities and ambition of one man: ... Abu Musab al-Zarqawi,' the organization's 'founding father.'") (citing expert report). *See also Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 (D.D.C. 2017) ("Although effectively the same organization throughout, the Zarqawi Terrorist Organization operated under various names during the time period relevant to this case, including, among others, 'Jamaat al-Tawhid wal-Jihad' ('JTJ'), 'al-Qaeda in Iraq' ('AQI') and 'Mujahidin Shura Council' ('MSC'). Despite these name changes, Plaintiffs presented undisputed expert testimony that the Zarqawi Terrorist Organization's ideology, strategy and leadership remained consistent throughout this period."). The Rayburn Declaration corroborates this conclusion. *See* Rayburn Rep. at 12-13.

made the same finding. *See, e.g., Brown*, 2023 U.S. Dist. LEXIS 129612, at \*23 (finding that "[p]laintiffs and their expert have sufficiently alleged that Iran's leadership and its Quds Force supported various groups including Shia Special Groups, JTJ  [AQI's predecessor organization, Jamaat Tawhid wa al-Jihad], AQI, and the Taliban in many ways," and awarding default judgment against Iran in favor of U.S. service members and military contractors injured in attacks in Iraq and Afghanistan between 2004-2012); *All*, 2023 U.S. Dist. LEXIS 135097, at \*26 (finding that "Iran has provided material support and resources to al-Qaeda by providing weapons training and allowing al-Qaeda to funnel funds and operatives through Iran," and awarding default judgment against Iran in favor of U.S. service members and military contractors killed in Iraq between 2006-2011) (citing expert report), *adopted by* Order, ECF No. 42 (D.D.C. July 13, 2023); *Roth*, 2023 U.S. Dist. LEXIS 7803, at \*11 (finding that "Iran provided AQI members with documents, identification cards, and passports to facilitate their movements" and "negotiated the release of AQI operatives from prison," and awarding default judgment against Iran in favor of U.S. service members injured in attacks in Iraq and Afghanistan between 2003 and 2013) (citing expert report).

Courts outside of this District have made the same findings. The court in *Espitia v. Islamic Republic of Iran* granted default judgment against Iran for providing material support to AQI, which injured a U.S. service member in Iraq "in a series of attacks" occurring between May and June 2003. *See* 2022 U.S. Dist. LEXIS 108841, at \*1. The court found that "Iran provided material support specifically to AQI," citing the plaintiffs' evidentiary sources reflecting that "[t]he United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a 'safe haven,' as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq." *Id.* at \*13 (record citations omitted). *See also Herrick v. Republic*, No. 21-cv-168,

2022 U.S. Dist. LEXIS 148002, at *13 (S.D. Tex. Aug. 17, 2022) (finding that the "evidence also demonstrates that Iran provided material support specifically to AQI" and awarding default judgment against Iran in favor of a U.S. service member injured by an AQI attack while serving in Iraq in 2007); *Battles v. Islamic Republic of Iran*, No. 21-cv-179, 2022 U.S. Dist. LEXIS 149033, at *7 (S.D. Tex. Aug. 17, 2022) (finding that "no later than early February [2004], a supply of arms flowed from Iran into al Qaeda strongholds in Iraq, and Iranian arms became an important part of al Qaeda's arsenal," and that "[s]ome of AQI's trademark attacks included suicide bombings, house bombings—and the previously mentioned [vehicle-borne IED] attacks," and awarding default judgment against Iran in favor of a U.S. service member injured by an AQI attack while serving in Iraq in 2004) (internal quotation marks omitted) (citing expert report).

This Court may take judicial notice of those findings made both within and outside this District, *see Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at *24, which are corroborated by the Rayburn Report. Specifically, the Rayburn Report reflects that Iran has cooperated with, and provided material support to, Al Qaeda, the group that spawned AQI, since the early 1990s, and acts as its main base of operations today. *See* Rayburn Rep. at 16-30. More specifically, Col. Rayburn described how the "Iranian regime's strong interests in enabling Sunni terrorists to attack U.S. interests superseded any sectarian differences between the Shi'a Iranian regime and these Sunni terrorist groups," *id.* at 7, an observation also made by experts in other cases. *See, e.g., Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at *14-15 (acknowledging that "it is perhaps odd to conclude, as Plaintiffs' experts do, that Iran, a predominately Shia country, would provide any support to the Zarqawi organization, a Sunni terrorist group that engaged in 'indiscriminate violence against Shia' in Iraq," but nonetheless making that conclusion). As the expert in that case also concluded, "Iran supported the Zarqawi organization, despite their ideological differences,

because it was fighting a mutual enemy in Iraq: the United States." *Id.* at \*15. This "marriage of convenience between Shia-led Iran and Sunni-dominated al-Qaeda has been recognized by other courts." *Id.* at \*16-17 (citing *Cabrera v. Islamic Republic of Iran*, 2022 U.S. Dist. LEXIS 127290, at \*36; *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 105-08 (D.D.C. 2015); *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*, No. 03-mdl-1570, 2011 U.S. Dist. LEXIS 155899, at \*107 (S.D.N.Y. Dec. 22, 2011); *Owens*, 826 F. Supp. 2d at 150). The relationship between Iran and Al Qaeda was summarized in *In re Terrorist Attacks* as follows:

> Both Iran and al Qaeda can be ruthlessly pragmatic, cutting deals with potential future adversaries to advance their causes in the short-term. Members of the Shiite and Sunni sects—particularly at the leadership level—often work together on terrorist operations. The religious differences, to the extent they retain any vitality at the leadership level, are trumped by the leaders' desire to confront and oppose common enemies, particularly the U.S.

2011 U.S. Dist. LEXIS 155899, at \*107 (internal record citations omitted).

In support of these goals, Iran provided Al Qaeda with funding and training in weapons, intelligence, and security. *See* Rayburn Rep. at 16-18. After the September 11, 2001, attacks, the Iranian regime "became vital to Al Qaeda's survival" by allowing the terrorist group to shift its main base of operations from Afghanistan to Iran. *See id.* at 18-20. Among the Al Qaeda members fleeing Afghanistan was Zarqawi, who entered Iran in December 2001 before moving to northern Iraq to establish a new base for his group, known at that time as JTJ. *See id.* at 20-21. Zarqawi was able to move back and forth across the Iran-Iraq border in 2001-2002 and received Iranian regime support for his organization, which later became known as Al Qaeda in Iraq, or AQI. *See id.* at 21. *See also Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at \*14 (referring to Zarqawi as AQI's "founding father").

Once the U.S. and Coalition groups commenced their campaign against Saddam Hussein's regime in Iraq in 2003, the Iranian regime took action to stop them from establishing a friendly

government in Iraq or from stabilizing the country on terms favorable to the U.S. *See* Rayburn Rep. at 21. Iran permitted Al Qaeda leaders to continue using it as a base from which to support AQI. Those leaders funneled money and operatives (whom they trained in Iran) into Iraq in order to carry out attacks on U.S. and Coalition forces. *See id.* at 22-24. For example, Iran's support for AQI in the form of funding and weapons was reported to the press in 2007 by a Coalition forces spokesman. *See id.* at 25.

Iran's support for AQI was coordinated primarily through its IRGC-QF and its Ministry of Intelligence and Security ("MOIS"). *See* Rayburn Rep. at 15, 22, 24. Section 1605A(a)(1) requires the material support to have been provided "by an official, employee, or agent" of Iran, for which the IRGC, IRGC-QF, and MOIS qualify. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80-81 (D.D.C. 2017) (holding that "it is well-established by courts in this district that MOIS and IRGC are the functional equivalent of Iran, thus qualifying as 'foreign states' as defined by the FSIA"); *Karcher*, 396 F. Supp. 3d at 55 ("The Court is satisfied that the Qods Force is at least an agent of Iran, if not a part of the government such that individuals working for it would be officials or employees of Iran.").

In its designation of Iran's MOIS for supporting terrorist groups, the U.S. Department of Treasury noted that MOIS "provided money and weapons" to AQI, and "negotiated prisoner releases of AQI operatives." Rayburn Rep. at 22 (citing Press Release, U.S. Dep't of Treasury, "Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism" (Feb. 16, 2012)). The Treasury Department also designated a senior general officer in Iran's IRGC-QF for similar activities. The officer, Ahmed Foruzandeh, was described as having "provide[d] financial and material support for acts of violence against Coalition Forces and Iraqi Security Forces" to Sunni terrorists, in addition to delivering weapons

to Iraq from Iran for such attacks by Sunni groups. *Id.* at 22-23 & n.20 (citing Press Release, U.S. Dep't of Treasury, "Treasury Designates Individuals, Entity Fueling Iraqi Insurgency" (Jan. 9, 2008)).

### ii.      Syria provided material support to AQI.

Courts have also found on multiple occasions that Syria provided AQI with material support and resources (including during the relevant period). *See, e.g.*, *Parhamovich*, No. 17-cv-61 (KBJ) (GMH), Magistrate Judge's Report and Recommendation, ECF No. 40 (D.D.C. June 23, 2021), *adopted by*, Order, ECF No. 52 (D.D.C. March 8, 2022), at 21-22 ("Plaintiffs contend that Syria provided material support and resources to ISI, including haven, training, and facilitating a pipeline of fighters into Iraq, at the time of the attack that led to Ms. Parhamovich's death. The undersigned finds that Plaintiffs' proof in that regard is satisfactory at the default stage."); *Mueller v. Syrian Arab Republic*, No. 18-cv-01229 (CJN), 2023 U.S. Dist. LEXIS 16233, at *14 (D.D.C. Jan. 31, 2023) ("It is therefore unsurprising that U.S. courts have repeatedly held Syria responsible for providing material support to ISIS and the previous iterations of the Zarqawi organization."); *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 138-39 (D.D.C. 2021) ("As explained at length above, the Court finds that Syria, consistent with its support of ISIS's predecessor organizations, provided ISIS support through the release of prisoners, financial assistance in the form of oil purchases and access to the international financial system, and strategic military cooperation that served the needs of the Assad regime."); *Doe v. Syrian Arab Republic*, No. 18-cv-00066 (KBJ), 2020 U.S. Dist. LEXIS 167697, at *22 (D.D.C. July 27, 2020) ("In this case, Dr. Gartenstein-Ross outlines the significant history of Syria's support for ISIS' predecessor, AQI."); *Maupin v. Syrian Arab Republic*, No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS 237831, at *10 (D.D.C. Mar. 20, 2019) ("The Court finds that Syria provided material support to the Zarqawi

Terrorist Organization throughout the relevant time period—roughly 2002 through 2006. During this period, Syria lent support to a number of terrorist groups by, among other things, providing them safe haven, weaponry, financial support, and even allowing them to open headquarters within Syria."); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016) ("The plaintiffs have supplied satisfactory proof that the defendants provided material support to Zarqawi and AQI, enabling them to perpetrate these attacks."); *Gates*, 580 F. Supp. 2d at 67 ("Syria in fact did provide material support and resources to Zarqawi and al-Qaeda in Iraq which contributed to hostage taking, torture, and extrajudicial killings.").

In those cases, the courts described the history of Syria's support for AQI through the 2000s. In *Sotloff*, the court explained that "Syrian government support for the terrorist network that morphed into ISIS goes back many years, to include support for foreign fighters traveling through Syria to join al Qaeda in Iraq (AQI, and specifically the terrorist network led by Abu Musab al Zarqawi) which later became ISIS," and "[t]he United States' invasion of Iraq in March 2003 opened a new chapter in Syria's role supporting Zarqawi's organization." 525 F. Supp. 3d at 127-28 (internal quotation marks omitted) (citing expert report). During this time, "Syria became 'a transit station for al-Qaeda foreign terrorists on their way to Iraq,' as Zarqawi facilitated the flow of 'money, of weapons, and terrorists intent on killing U.S. coalition forces and innocent Iraqis.'" *Id.* at 128 (citing expert testimony).

The court in *Doe* also adopted the description of the expert in that case detailing the close relationship between AQI and the Syrian government. *See* 2020 U.S. Dist. LEXIS 167697, *23-24. The court cited testimony by David Schenker, an official from the Office of the Secretary of Defense from 2002-2006, describing how the Assad regime allowed AQI to establish an office across the street from the U.S. embassy in Damascus just months prior to the U.S. invasion of Iraq

"where would-be insurgents could sign up and board a bus to travel to Baghdad." *Id.* (citing testimony). Furthermore, an AQI recruiter named Abu Qaqaa "maintained [such] a strong relationship with the Syrian regime" that "by the time of his assassination in 2007 he was considered 'to be an agent of the Syrian state.'" *Id.* at *24 (citing expert report). In *Thuneibat*, the court, also relying on an expert declaration of David Schenker, found that the Syrian government provided "crucial 'material support'" to AQI by:

> (1) providing an established and stable "transit pipeline" such that foreign fighters from other countries were able to enter target countries through Syria, (2) allowing AQI supporters and deputies to operate in Syria unmolested despite government awareness of their presence and terrorist activities, and (3) providing essential financial services to Zarqawi, who financed [ ] attacks using funds "that moved through Syria."

167 F. Supp. 3d at 36 (citing expert report). Thus, the cases in this District sufficiently establish Syria's longstanding material support for AQI and its successors over the years.

These conclusions are further bolstered by the Rayburn Report, which describes how Syria supported AQI during the U.S.-led invasion of Iraq, motivated not only by its interest in undermining U.S. and Coalition forces there, but also to "gain leverage and political influence in the post-Saddam Iraq." Rayburn Rep. at 30. This has been Syria's goal historically, which it accomplishes by "sponsoring the militant opposition to each of Syria's neighboring governments," *id.* at 31, even when that support benefited a sect at odds with the Assad regime. *See id.* at 31-32. In fact, according to the Rayburn Report, "Syrian regime support to Al Qaeda in Iraq and similar STGIs terrorist groups was a high policy priority within the Assad regime, emanating from the highest levels of regime leadership. Bashar al-Assad was directly involved in formulating the policy and instructing Syrian government leaders and agencies on implementing the policy." *Id.* at 32. Assad even made his brother-in-law, General Assef Shawkat, the lead for executing the policy via Shawkat's Syrian Military Intelligence directorate, and several other Syrian government

agencies also arranged support for AQI. *See id. See also id.* at 35 ("Beyond the intelligence agencies, Syrian ministries and civil administrations also received orders to help Syrians join the jihad in Iraq.").

A former Syrian official reported to the Western press that thousands of fighters were given safe passage to cross from Syria into Iraq at the time of the U.S. invasion. *See id.* at 32. Furthermore, "[i]n a hearing before the Senate Armed Services Committee in 2003, then Deputy Secretary of Defense Paul Wolfowitz testified that several foreign fighters killed by U.S. forces in Iraq went there through Syria, and the entry permits on their passports said 'volunteer for jihad,' or 'to join the Arab volunteers,' indicating that Syria was well aware of the jihadi nature of these transient volunteer soldiers as they passed through Syrian borders." *Thuneibat*, 167 F. Supp. 3d at 29 (citing expert report). *See also id.* at 30 ("The State Department's 2005 Patterns of Global Terrorism publication concluded that Syria remained a 'facilitation hub for terrorists operating in Iraq.' In 2007, then-General David Petraeus echoed that Syria acts as 'critical support for the AQI insurgency in Iraq,' and plays a 'pivotal role as the source of foreign fighters entering Iraq.'") (citing record and expert report); *Gates*, 580 F. Supp. 2d at 59 ("Plaintiffs presented expert witness testimony and testimony from an Iraqi countryman concerning Syria's assistance to Zarqawi and al-Qaeda in Iraq. From this evidence, certain conclusions are clear. Syria was the critical geographic entry point for Zarqawi's fighters into Iraq, and served as a 'logistical hub' for Zarqawi. Syria supported Zarqawi and his organization by: (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his terrorist network in Iraq.") (citing expert testimony); *Doe*, 2020 U.S. Dist. LEXIS 167697, at *23 ("Beyond a generally permissive attitude toward the terrorist organization, the Syrian government

29

was 'part of an operation to smuggle jihadist volunteers into Iraq from Syria after the 2003 invasion.'") (citing expert report).

Although many of these jihadists returned after the fall of Saddam Hussein, about 5,000 remained, and formed the foreign core of the Sunni terrorist groups operating in Iraq. *See* Rayburn Rep. at 33. These fighters included Sunni extremists released from Syrian jails for the purpose of fighting in Iraq, many of whom became important leaders and operatives in Sunni terrorist groups operating in Iraq, including AQI. *See id.* at 33-34. They were joined by the remnants of the Iraqi Baathist regime after Saddam fell from power, who Syria supported in mounting terrorist attacks against U.S. and Coalition forces. *See id.* at 35-36. Illustrating this point, the Treasury Department designated Fawzi Mutlaq al Rawi, whom Assad appointed to head the Iraqi branch of the Syrian Baath Party in 2003, for providing financial and material support to AQI. That support included the provision of $300,000, vehicle-borne improvised explosive devices, rifles, and suicide bombers. *See id.* at 36 & n.55 (citing Press Release, U.S. Treasury Dep't, "Treasury Designates Individuals with Ties to Al Qaida, Former Regime" (Dec. 7, 2007)). Al-Rawi also met with senior AQI leaders in Iraq to discuss financing, unifying AQI forces, conducting airborne IED attacks against the U.S. Embassy, and concentrating attacks against the international zone. *See* Press Release.

Syria's material support to AQI became even more valuable after the fall of 2006, when local Iraqi Sunni tribal militias began to join forces with U.S. troops and Iraqi security forces against AQI as part of the above-mentioned "Awakening" movement prompted by a backlash to AQI's heavy-handed treatment of Sunni communities in northern and western Iraq. *See* Rayburn Rep. at 38. AQI was forced to relocate from Iraqi cities in which it had operated comfortably to Syrian territory. *See id.* "Without the Syrian regime's policy of allowing AQI and other STGIs to

use Syrian territory as a safe haven and logistics base, it is unlikely AQI would have been able to survive the threat the Awakening posed to the terrorist group in 2007-2008." *Id.* at 38-39.

### iii.     Defendants' material support to AQI enabled it to commit the attacks.

Plaintiffs must also show that Defendants' material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," *Owens*, 864 F.3d at 794, although the provision of material support does not need to "go directly for the specific act." *Id.* at 799. Because material support "is difficult to trace" and "is fungible," courts do not require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id.* Instead, there need only be evidence that Defendants' actions were a "substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

The Rayburn Report confirms that Defendants' material support or resources proximately caused the attacks at issue. Col. Rayburn undertook a detailed analysis of each attack, attributed each attack to AQI or its associated STGIs, and submitted proof—in addition to the judicially-noticed factual findings—of how Defendants, through material support or resources, supported AQI and its associated STGIs, and how the attacks were a foreseeable – and desired – result of this support. Central to Col. Rayburn's description of Iran's support for AQI is his explanation of the Iranian regime's goal of "harming the interests of the United States and its allies in the Middle East." Rayburn Rep. at 16. This goal focused the Iranian regime on Iraq after the U.S. and Coalition forces invaded Iraq to end the regime of Saddam Hussein, when "the Iranian regime sought to prevent the United States and its allies from establishing a friendly government in Iraq or from

stabilizing the country on terms favorable to the United States." *Id.* at 21. *See also id.* at 7 ("The Iranian regime's material support to Al Qaeda and other Sunni terrorist groups expanded significantly after the fall of the Saddam Hussein regime in 2003, when Khamenei and other senior Iranian leaders considered it imperative to prevent the United States and its allies from establishing a stable, pro-U.S. state in Iraq."). "Iranian regime leaders viewed the U.S. military presence and political influence in Iraq as a threat to Iranian regime interests, and they also considered Islamist militias and terrorist groups as assets or allies in thwarting U.S. objectives in the region." *Id.* at 21. To this end, Iran materially supported both Shi'a and Sunni extremist groups, including AQI, in carrying out attacks against U.S. and Coalition forces in Iraq. *See id.* at 21-22.

Similarly, Col. Rayburn described how the "Syrian regime considered these attacks to be in its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq." *Id.* at 30. *See also id.* at 8 ("Syrian ruler Bashar al-Assad and his regime adopted a policy of enabling AQI and other STGIs to conduct terrorist attacks in Iraq to cause the failure of the U.S.-led military campaign in Iraq and to gain regional political leverage in the post-Saddam Iraq."). Another benefit the Assad regime received in supporting these attacks was that it was able "to actively channel Syrian Sunni extremists' activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 31.

According to the Rayburn Report, "the material support the governments of Iran and Syria provided to AQI and its associated STGIs was essential to these groups' terrorist operations, including their ability to conduct attacks in Iraq." *Id.* at 9. "AQI and its associated STGIs could not have operated effectively in Iraq without the logistical support, territorial safe haven, personnel recruitment, weapons, explosives, training, and other categories of support that the Iranian and

Syrian governments provided." *Id.* More specifically, "[w]ithout this indispensable Iranian and Syrian material support, it is highly unlikely AQI and its associated STGIs would have been able to conduct terrorist attacks on a sustainable basis in Iraq, including the attacks against U.S. forces and civilians" included in this case. *Id.* Accordingly, Plaintiffs have demonstrated that Defendants' material support and resources in support of AQI's terrorist activities caused their injuries.

      **b.**    **Personal Jurisdiction**

      Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for subject matter jurisdiction. The second element is also satisfied because Iran and Syria were each properly served.

      The four methods of obtaining proper service in FSIA cases are set forth in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1608(a)(1)–(4). Each must be attempted in descending order, but only to the extent feasible in a specific case or applicable to a specific defendant. *See id.* The first two methods—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention"—do not apply here. Plaintiffs have no "special arrangement" for service with Iran or Syria, and neither Defendant is a party to any "international convention on service of judicial documents." *See Thuneibat*, 167 F. Supp. 3d at 37; *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017). Plaintiffs therefore proceeded with the next two steps, via mail pursuant to 28 U.S.C. § 1608(a)(3), and then diplomatic service via the U.S. Department of State as directed by 28 U.S.C. § 1608(a)(4). As described above in Section I, Plaintiffs successfully served Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on June 15, 2022, and June 23, 2022, respectively. *See* ECF Nos. 21 and 22.

Thus, because this Court has subject-matter jurisdiction over this matter, *see supra,* Section IV.a, and since Plaintiffs fully complied with the service requirements of Section 1608(a), this Court has personal jurisdiction over Iran and Syria in this matter. *See* 28 U.S.C. § 1330(b).

## V.   THEORIES OF LIABILITY

"Having concluded that the Court possesses subject matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief." *Fritz*, 320 F. Supp. 3d at 86. Plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages" under the FSIA's private cause of action set forth in 28 U.S.C. § 1605A(c), and "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Id.* at 86–87 (quoting *Foley*, 249 F. Supp. 3d at 205). "[A] plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government ... acting within the scope of the employee's employment,' or 'the legal representative of' any such person." *Id.* at 87 (citing *Foley*, 249 F. Supp. 3d at 205).

Here, the elements of the § 1605A(c) cause of action are all met: (1) Defendants were each designated as State Sponsors of Terrorism at the time of the attacks and remain so designated today; (2) each of the Plaintiffs are U.S. citizens, a member of the armed forces, or a U.S. contractor; and (3) money damages are sought for injuries caused by the attacks. Plaintiffs respectfully request that they be permitted to move for the appointment of a special master to whom they can submit evidence of their "economic damages, solatium, [and] pain and suffering" claims (as well as evidence of U.S. citizenship for the family member Plaintiffs who are not

included in the Section 1605A(a)(2)(A)(ii) Appendix) once this Court has issued a decision on their motion for default judgment.

Plaintiffs also seek punitive damages under 28 U.S.C. § 1605A(c), meant to "punish" and "deter" defendants' "outrageous behavior." *Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 140 (D.D.C. 2019).[5] This Court has awarded punitive damages in FSIA cases in amounts equal to the compensatory damages awarded. *See Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529, at *18 (D.D.C. Jan. 19, 2022), *vacated on other grounds, motion granted by, judgment entered by*, 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022); *Abedini*, 422 F. Supp. 3d at 142. Given the prior stated reasoning in those cases, Plaintiffs respectfully request that the Court award punitive damages utilizing this Court's prior approach should it find Defendants liable for the attacks at issue and ultimately award compensatory damages to Plaintiffs in this case.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter default judgment against Defendants Iran and Syria. Plaintiffs also respectfully request that the Court refer Plaintiffs' damages claims and proofs of citizenship for family member Plaintiffs to a special master for preparation of reports and recommendations consistent with the Court's opinion.

---

[5]    The Supreme Court in *Opati v. Republic of Sudan* made clear that punitive damages are not limited to attacks post-dating the 2008 enactment of 28 U.S.C. § 1605A. *See* 140 S. Ct. at 1603.

Dated: September 20, 2023

Respectfully submitted,

**OSEN LLC**

By:   <u>/s/ Dina Gielchinsky</u>
        Dina Gielchinsky (DC Bar No. NJ011)
        Gary Osen (DC Bar No. NJ009)
        Ari Ungar (DC Bar No. NJ008)
        Michael Radine (DC Bar NJ015)
        Aaron Schlanger (DC Bar No. NJ007)
        190 Moore Street, Suite 272
        Hackensack, New Jersey 07601
        Tel.: (201) 265-6400
        Fax: (201) 265-0303

        *Attorneys for Plaintiffs*