**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JACOB PAUTSCH, *et al.*,

     **Plaintiffs,**

       **v.**                   **Civil Action No. 20-3859 (JEB)**

ISLAMIC REPUBLIC OF IRAN, *et al.*,

     **Defendants.**

## MEMORANDUM OPINION

The remaining Plaintiffs here are seven servicemembers and civilian contractors, as well as two of their family members, who sued the Islamic Republic of Iran and the Syrian Arab Republic under the Foreign Sovereign Immunities Act for providing material support to terrorism. As survivors of terrorist attacks in Iraq from 2004 to 2009, Plaintiffs seek to recover for the injuries sustained as a result of those attacks. The Court entered a default judgment against Defendants last year. It now assesses damages.

**I.      Procedural Background**

This litigation began in December 2020 when Plaintiffs filed their original Complaint. See ECF No. 1 (Compl.). After almost two years passed with no response from either Iran or Syria, the Clerk's Office issued defaults against both in September 2022. See ECF Nos. 25 (Iran Def.); 26 (Syria Def.). The Court then issued a default judgment as to liability with respect to the estate and family members of one servicemember who had been killed in an attack, Jacob Pautsch, and the family members of those who were injured in other attacks. Pautsch v. Islamic Republic of Iran, 2023 WL 8433216, at *5–6 (D.D.C. Dec. 5, 2023). The Court found that the

other surviving servicemembers had failed to state a theory of liability that would enable them to recover.  Id. at *6.

Plaintiffs then took a second bite at the apple by filing an Amended Complaint in February 2024.  See ECF No. 40 (Am. Compl.).  Defendants again defaulted.  See ECF No. 42 (Second Def.).  Before the Court had an opportunity to determine whether Plaintiffs had stated a valid theory of recovery in their second attempt, however, the D.C. Circuit issued a decision that called into question whether the FSIA in fact waived Defendants' immunity over the survivors' claims.  See Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061–67 (D.C. Cir. 2024).  The Court, with the benefit of supplemental briefing from Plaintiffs, ultimately concluded that the FSIA does waive immunity for seven out of the eight survivors who had originally brought suit. See ECF No. 60 (Second Def. Judgment Mem. Op.) at 10.  It also found that Plaintiffs had sufficiently articulated a cause of action under the FSIA.  Id. at 12.  It accordingly issued a default judgment on liability as to those seven servicemembers and contractors.  Id.  The Court also awarded damages to Pautsch's estate and family members.  See ECF No. 68 (Pautsch Damages Order).

Plaintiffs have now submitted Proposed Findings of Fact and Conclusions of Law on Damages for the seven Plaintiffs addressed by that default judgment: Charles J. Shaffer, Brian Neuman, Wallace Byars, III, Dennis O'Malley, Jason Goldsmith, Richard Vessell, and Thomas Vriens.  See ECF No. 67-1 (PFFCL).  The Court also addresses the claims of Charles L. Shaffer, Jr. and Erika Neuman, family members of two of the servicemember Plaintiffs.  It will now determine the amount of damages owed to each.

## II.    Legal Standard

Plaintiffs seek three types of damages: economic-loss damages, direct-injury damages, and solatium damages.  Economic-loss damages "may be proven by the submission of a forensic economist's expert report." Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 402 (D.D.C. 2015).  In determining the amount of such damages based on lost future earnings and other benefits, "the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." Id.

That leaves direct-injury and solatium damages.  The former are intended to compensate attack survivors based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (quotation marks omitted); accord Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 37 (D.D.C. 2012).  Over the years, courts have developed a general framework for awarding direct-injury damages based on the guiding principle that "when calculating damages awards," courts should "take pains to ensure that individuals with similar injuries receive similar awards." Owens v. Republic of Sudan, 71 F. Supp. 3d 252, 259 (D.D.C. 2014) (quotation marks omitted).  They begin "with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." Wultz, 864 F. Supp. 2d at 37–38 (emphasis added).  Such substantial injuries include "compound fractures" and "severe flesh wounds." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 84 (D.D.C. 2010); see also Peterson v. Islamic Republic of Iran (Peterson II), 515 F. Supp. 2d 25, 54 (D.D.C. 2007). Courts deviate downwards and award damages between $2 and $3 million for less severe physical injuries, such as "where victims suffered only minor shrapnel injuries or minor injury

from small-arms fire" in addition to psychological trauma.  See Valore, 700 F. Supp. 2d at 84; Peterson II, 515 F. Supp. 2d at 54–55.

Most useful here is the more granulated framework for direct physical injuries that Judge John D. Bates of our district articulated in Wamai v. Republic of Sudan, 60 F. Supp. 3d 84 (D.D.C. 2014), aff'd in part, vacated in part on other grounds sub nom. Owens v. Republic of Sudan, 864 F.3d 751, 825 (D.C. Cir. 2017), vacated sub nom. Opati v. Republic of Sudan, 590 U.S. 418 (2020).  In Wamai, Judge Bates awarded damages to victims of the 1998 bombings of the U.S. Embassies in Kenya and Tanzania.  Recognizing that "[a] great number of plaintiffs were injured in the bombings" and that the plaintiffs' injuries "span[ned] a broad range," id at 91, he identified six general categories of plaintiffs.  For those who suffered little to no physical injury, the court awarded $1.5 million.  Id. at 92.  The court increased that award to $2 million for plaintiffs who suffered injuries "such as lacerations and contusions caused by shrapnel," id., and to $2.5 million for people "who suffered more serious physical injuries, such as broken bones, head trauma, some hearing or vision impairment, or impotence."  Id.  Moving upward, those "with even more serious injuries," such as "spinal injuries not resulting in paralysis, more serious shrapnel injuries, head trauma, or serious hearing impairment," received $3 million.  Id. Victims who suffered injuries similar to those for which other courts had awarded the "baseline" of $5 million — including "vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays . . . and permanent injuries" — received that baseline amount.  Id. at 92–93.  Finally, people with "even more grievous wounds such as lost eyes [or] extreme burns . . . or [who] endured months of recovery in hospitals" received awards of $7.5 million.  Id. at 93.  These categories all assume severe psychological injuries.  Id. at 92–93.  That framework aids this Court in its determinations of direct damages.

Solatium damages, by contrast, serve a different purpose. As defined by the D.C. Circuit in Fraenkel v. Islamic Republic of Iran, 892 F.3d 348 (D.C. Cir. 2018), these damages seek to compensate victims for the "[m]ental anguish, bereavement and grief" resulting from a loved one's death or injury. Id. at 356–57; see also Valore, 700 F. Supp. 2d at 85. To determine proper solatium awards, the Fraenkel panel recognized that "District Court judges invariably must exercise discretion in determining damages awards under the FSIA." 892 F.3d at 361. Appellants there had argued that the district court "broke from precedent" by awarding solatium damages "dramatically lower" than those received by similarly situated plaintiffs. Id. (quotation marks omitted). The D.C. Circuit rejected their claim. It noted that "many FSIA decisions" followed the solatium-damage ranges summarized in Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006), which recommended awarding around $2.5 million for siblings of deceased victims, $5 million for parents, and $8–$12 million for spouses. See Fraenkel, 892 F.3d at 361. But the Circuit "decline[d] to impose Heiser's framework as a mandatory scheme," id., holding that "[t]he decision in Heiser . . . is not binding precedent" and that, subject to abuse-of-discretion review, district courts have wide latitude to craft damage awards "based on the particular facts of each case." Id. at 351.

As instructed, this Court will exercise its discretion in fashioning equitable solatium awards. It will do so based on the factors our Circuit instructed courts to consider in Fraenkel. See 892 F.3d at 357. The Court will particularly focus on the "nature of the relationship" between the claimant and the directly injured plaintiff. Id. (quoting Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 31 (D.D.C. 1998)).

### III.    Analysis

All Plaintiffs here bring causes of action for assault, battery, and intentional infliction of emotional distress (IIED).  As the facts underlying each Plaintiff's claim differ significantly in most respects, the Court will consider each claim individually.

### A.    Mosul Attack

Charles J. Shaffer and his father, Charles L. Shaffer, Jr., seek compensation for this attack.

#### 1.    *Charles J. Shaffer*

On the morning of September 1, 2008, Shaffer was driving an MWRAP Humvee during a "routine clearance mission" with his unit.  Id. at 8.  As they were driving through a market, a rocket-propelled grenade (RPG) struck the vehicle and ignited a fire.  Id. at 8–9.

Shaffer was severely injured.  Id. at 9–11.  He tried to stop the vehicle by braking but could not given the extent of his injuries.  Id. at 9.  After the vehicle eventually came to a stop, he realized that his right leg had been gravely wounded.  Id.  He could see "muscle, fat, and even the inside of [his] bone.  [He] also saw bite-sized chunks of [his] leg on the floor, and much of [his] right leg was actually under [his] seat."  Id. at 9.  He was left in excruciating pain.  Id. at 10.  In addition to the traumatic injury to his right leg, shrapnel struck his left leg and other parts of his body, including his "head, abdomen, upper leg and thigh, knee, ankle and foot, and toes."  Id. at 10–11.  The severity of these injuries ultimately required Shaffer to undergo approximately 60 surgeries to remove the embedded shrapnel.  Id. at 11.  This attack not only caused severe short-term injuries but also led to long-term, life-altering consequences.  The full scope of Shaffer's injuries includes:

> amputation of upper right leg; deep laceration to left leg; shrapnel injuries to left leg; burns to face and hands; hearing loss and tinnitus;

> diagnosis of [post-traumatic stress disorder (PTSD)]; diagnoses of [traumatic brain injury (TBI)], post-concussion syndrome, cognitive disorder, and memory issues; diagnos[is] [of] depression; diagnoses of adjustment disorder with mixed anxiety and depressed mood; ongoing lung-related issues; and continuing physical and phantom pain and cognitive challenges.

Id. at 40 (capitalization and spacing altered).

Shaffer requests $2,587,297.77 in economic losses, as well as $9 million for pain and suffering. Id. at 41–42. Dr. L. Wayne Plumly, Jr., submitted an expert report to calculate Shaffer's economic losses. See ECF No. 64-12 (Shaffer Expert Report). Plumly calculated the present value of Shaffer's lost income based on several assumptions: (1) he would have served 20 years in the military; (2) he had a life expectancy of 76.84 years; (3) upon retirement, he would have received an annual military pension of $41,425.57, increasing annually by 2.775% in line with the Employment Cost Index; (4) he would have qualified for full pension benefits; (5) following his military service, he would have worked as a transportation inspector in the St. Louis metropolitan area, earning $75,340 per year, with wages rising annually based on the historical average increase in hourly earnings for production and nonsupervisory employees; and (6) he would have begun receiving Social Security retirement benefits at age 67. Id. at 3–4. Plumly further adjusted the income for taxes and the Social Security benefits for inflation, and he discounted all future losses to their present values using the average 30-year Treasury yield from 2006 to 2023. Id. at 4–5. This methodology generally comports with how economic loss was calculated in similar cases. See, e.g., Murphy v. Islamic Republic of Iran, No. 06-596, ECF No. 55-1 (Loss Calculation) (D.D.C. June 10, 2010) (calculating economic loss for injured servicemember). The Court finds that the estimate is reasonable and thus awards $2,587,297.77 to Shaffer to compensate for economic loss.

As for the pain and suffering, Shaffer claims that his injuries are like those sustained by the plaintiffs in <u>Roth v. Islamic Republic of Iran</u>, 2023 WL 3203032 (D.D.C. May 2, 2023). In <u>Roth</u>, two veterans, Robert S. Bruce and Brent R. Jurgersen, were each assigned 100% disability ratings by the Department of Veterans Affairs. <u>Id.</u> at *3. Their injuries included amputations, TBIs, and extended periods of unconsciousness. <u>Id.</u> Jurgersen "spent a month in intensive care" and underwent "multiple facial and dental surgeries." <u>Id.</u>; <u>see also</u> <u>Roth v. Islamic Republic of Iran</u>, 651 F. Supp. 3d 65, 82 (D.D.C. Jan. 17, 2023). Both plaintiffs also faced substantial medical expenses for the rest of their lives. <u>Roth</u>, 2023 WL 3203032, at *3. As a result, the court awarded Bruce and Jurgersen $9 million each in compensatory damages — an upward departure from the $5 million baseline, consistent with awards in similar cases. <u>Id.</u>

Plaintiff also compares his injuries to those sustained by Captain Ryan Gregory Timoney in <u>Cabrera v. Islamic Republic of Iran</u>, 2022 WL 2817730 (D.D.C. July 19, 2022). In <u>Cabrera</u>, Timoney, one of the plaintiffs in that case, was severely injured in a suicide bomb attack in Afghanistan. <u>Id.</u> at *29–30. His injuries were extensive, caused by ball bearings used as shrapnel by the suicide bomber. <u>Id.</u> at *30. The blast damaged his left leg, ultimately leading to an amputation, and also caused serious injuries to his upper left leg, abdomen, chest, spine, and left bicep. <u>Id.</u> It also led to severe TBI, where shrapnel entered "the left side of [his] skull, straight through [his] brain. It . . . hit [his] optic nerve a little bit and then . . . the interior of the right side of [his] skull. " <u>Id.</u>

The court awarded $9 million in pain and suffering damages to Timoney, finding that he had suffered "excruciating injuries which will have lifelong effects — including pain, loss of mobility, neurological issues, and mental and emotional trauma." <u>Id.</u> at *163. The court noted

that these awards were consistent with prior cases.  Id.; see also Peterson II, 515 F. Supp. 2d at 56.

Shaffer therefore requests a comparable award of $9 million.  Although Shaffer's injuries are not identical to those suffered by the plaintiffs in Roth and Cabrera, there are some similarities, such as the amputation of a leg, injuries to both legs, shrapnel wounds, and resulting emotional harm.  There are also, however, key differences.  In Roth, for example, Jurgersen was an amputee who "suffered traumatic brain injuries,"  2023 WL 3203032, at *3, including a "compressed skull fracture with a brain hematoma."  Roth v. Islamic Republic of Iran, 651 F. Supp. 3d 65, 81 (D.D.C. 2023).  While Shaffer suffered head injuries and was diagnosed with TBI, he did not suffer brain injuries on the same scale as those in Roth.  Likewise, Shaffer's injuries differ from those of Timoney, who sustained "multiple internal injuries from shrapnel, including damage to his optic nerve and brain."  Cabrera, 2022 WL 2817730, at *44.  Timoney, furthermore, "spent over 10 months inpatient at hospitals while doctors tried to save his vision and reduce the swelling on his brain."  Id.  After the attack, Timoney remained under a "constant threat of seizures induced by fluorescent and flickering lights."  Id.  Shaffer's injuries are no doubt extremely serious, but they do not include the kind of severe brain injuries that warranted higher awards in Roth and Cabrera.  The Court therefore declines to rely on Roth or Cabrera as the basis for the damages award.

Instead, the Court applies the framework set forth in Wamai to assess pain and suffering.  In Wamai, Judge Bates explained that "courts in this district . . . award[] a baseline of $5 million to individuals who suffer severe physical injuries."  60 F. Supp. 3d at 91.  The court further noted that "for a few plaintiffs, who suffered even more grievous wounds such as lost eyes, extreme burns, severe skull fractures, brain damage, ruptured lungs, or endured months of recovery in

hospitals, upward departures to $7.5 million are in order." Id.  Although no amount can fully compensate for Plaintiff's suffering, this Court finds an award of $7.5 million is appropriate in light of Shaffer's extensive pain and injuries.

2.    *Charles L. Shaffer, Jr.*

Charles L. Shaffer, Jr., Shaffer's father, seeks $2.5 million for the severe emotional distress he endured as a result of his son's injuries and long recovery.  As Shaffer's father, he "not only observed his son's injuries up close and in vivid detail, [but] he also witnessed his care first-hand."  PFFCL at 47.  He watched Shaffer endure relentless pain and the challenges of recovery, and Shaffer, Jr. admitted that "[he] suffered in [his] own way, too."  Id. at 49.  As a Vietnam veteran, Shaffer, Jr. was affected by seeing his son's condition, triggering "nightmares and flashbacks to his time in Vietnam."  Id.  Shaffer, Jr., furthermore, carries a sense of personal guilt over his son's condition, "because [he] gave [Shaffer] the ultimatum to choose between college, work, and the military."  Id. at 53.  He further confessed that "[he] live[s] with that guilt every day and will continue to feel it in some way until [he's] dead."  Id.

The general framework for solatium awards applies in this case: "The appropriate damages for [parents] of injured victims is . . . $2.5 million."  Wamai, 60 F. Supp. 3d at 94; see also Peterson II, 515 F. Supp. 2d at 51–53.  The Court therefore concludes that the appropriate amount of damages for Shaffer, Jr., is $2.5 million.

B.    Fallujah Attack

Brian Neuman and his wife Erika Neuman seek damages for this attack.

1.    *Brian Neuman*

On November 11, 2004, Brian Neuman, then the leader of a three-man Psychological Operations (PSYOPS) team, was riding in a Bradley vehicle in Fallujah when it was struck by an

10

Improvised Explosive Device (IED), causing him severe injuries.  See PFFCL at 57–58.  The

IED entered through the rear of the vehicle, unleashing a devastating blast that tore through

Neuman's body armor and severed his left arm at the upper humerus.  Id. at 58.  Shrapnel also

embedded in his right leg and hand, causing additional wounds.  Id.  Sitting next to Neuman was

his interpreter, Ismail Zebari, who was killed instantly.  Id.

Following the attack, Neuman's arm was amputated and subsequently required "multiple

revision surgeries" at the amputation site.  Id. at 63.  Those revision surgeries involved

addressing the damaged area and sometimes included "filing down what was left of the bone."

Id.  In addition to the physical pain caused by the traumatic injuries, Neuman also suffered from

phantom limb pain, an "intense pain" that felt as though it was "coming from areas of [his] arm

that no longer exist[ed]."  Id. at 61.  Neuman's overall physical and psychological injuries

include: "Amputation of upper left arm; Large laceration to right leg; Shrapnel injuries to right

leg, hand, and fingers; Diagnosis of PTSD; and Continuing physical and phantom pain."  Id. at

79.  In light of the severity and lasting impact of these injuries, Neuman requests damages of $8

million.  Id.

Neuman relies on Peterson II and the injuries of a second plaintiff in Cabrera to support

his request for an $8 million award.  In Peterson II, a plaintiff who "suffered a torn ear, broken

leg, damaged foot, and cuts from shrapnel from [an] attack," along with "lasting and severe

psychological problems from the attack," was awarded $7 million.  See 515 F. Supp. 2d at 55–

56.  By contrast, in Cabrera, Sergeant Jared Satoshi Lemon suffered even graver injuries after an

IED attack.  See 2022 WL 2817730, at *27–28.  "His right arm was amputated, and he spent four

and a half years recovering."  Id. at *27 (quotation marks omitted).  That recovery included

additional surgeries, such as a "skin graft from his thigh to his shoulder," which he described as

"more painful than the actual amputation."  Id.  Sergeant Lemon also "endured heterotopic ossification, or the growth of bone spurs from the amputated limb into surrounding soft tissue." Id. at *28.  He also "suffered a [TBI], which continue[d] to affect his memory and concentration."  Id.

The court awarded $9 million in pain and suffering damages to Lemon.  It found that he suffered "excruciating injuries which will have lifelong effects — including pain, loss of mobility, neurological issues, and mental and emotional trauma."  Id. at *45.  The court noted that these awards were consistent with prior cases.  Id.; see also Peterson II, 515 F. Supp. 2d at 56.

The Court agrees that plaintiffs with comparable injuries have previously received awards ranging from $7 million to $9 million.  See Peterson II, 515 F. Supp. 2d at 55–56; Cabrera, 2022 WL 2817730, at *45.  As Wamai explains, "Where physical and psychological pain is more severe — such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead — courts have departed upward from [a $5 million] baseline to $7 million and above."  60 F. Supp. 3d at 91. While Neuman was not rendered quadriplegic or partially blinded, he continues to suffer from debilitating phantom limb pain to this day.  The traumatic amputation of his left arm, multiple revision surgeries, laceration to his right leg, persistent phantom limb pain, and additional injuries collectively demonstrate the presence of "numerous and severe injuries."  PFFCL at 57– 79.  For the same reasons as Shaffer, the Court also awards $7.5 million for Neuman's pain and suffering.

2.    *Erika Neuman*

Erika Neuman is now Brian Neuman's wife, though they were unmarried at the time Neuman was injured.  She requests $4 million in solatium damages, the standard award for the spouses of injured victims who were married at the time of the attack.  Peterson II, 515 F. Supp. 2d at 51–53; Wamai, 60 F. Supp. 3d at 94.  Courts have recognized spousal recovery for unmarried couples in limited circumstances where the plaintiff resided in the same household as the victim or shared a relationship that functionally mirrored familial bonds.  See Bettis v. Islamic Republic of Iran, 315 F.3d 325, 337 (D.C. Cir. 2003); Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260, 270 (D.D.C. 2002).  For example, in Surette, the court allowed recovery by a woman who, though not legally married to the victim, had lived with him for over 20 years in a "bond that was the functional equivalent of a legal marriage."  231 F. Supp. 2d at 270.

Erika argues that she and Neuman had such a bond at the time he was injured.  Although the Court appreciates the depth of their relationship, it does not see it as equivalent to marriage. Erika enlisted in the military reserves in 2000 and met Neuman during training at Fort Bragg in 2002, though they were unable to date during their training.  See PFFCL at 79–80.  In October 2002, Erika departed Fort Bragg to attend airborne training at Fort Benning.  Id. at 80.  During their time apart, she and Neuman stayed in frequent contact.  Id.  The two eventually began dating after they concluded their training.  Id. at 81.  After December 2002, the couple lived together but were not formally married.  Id. at 82.  They discussed the possibility of marriage before Erika deployed to Iraq in 2003.  Id. at 56, 82–83.  Neuman was subsequently deployed to Afghanistan and promised to be in the United States when she returned.  Id. at 83.  Given circumstances beyond his control, however, he had to remain overseas, and Erika returned to Texas thereafter.  Id.  When Neuman eventually came back to the United States, he reached out

to Erika "to reconnect and rekindle what [they] shared." Id. He then deployed again to Iraq. After Neuman was severely injured in the attack, Erika quickly flew to Walter Reed to support him and has remained by his side ever since. Id. at 84–85. The couple married in 2006 and now have three children. Id. at 93.

Plaintiffs rely on Gration v. Islamic Republic of Iran, 2023 WL 5221955 (D.D.C. Aug. 15, 2023), to argue that they shared a "marital bond" despite not being legally married at the time of the attack. The typical $4 million award for spouses, as they see it, is warranted in light of that bond. Based on the evidence presented, however, the Court is not convinced that Erika and Neuman in fact shared a bond that was the functional equivalent of marriage at the time of the attack. Plaintiffs allege that they "essentially lived together" by December 2002, though they were not formally married at that time. See PFFCL at 82. This appears to have been a relatively short period, as Erika was deployed to Iraq in 2003. Id. The couple, moreover, had only just "rekindled" their relationship at the time that Neuman redeployed to Iraq after his brief return to the United States. Id. at 83.

Erika and Neuman's relationship at the time of the attack thus does not meet the threshold set in Gration, where the court found that "two of the plaintiffs . . . were the functional equivalent of spouses given that their 'bond' with the relevant servicemember plaintiff 'was the functional equivalent of marriage' at the time of the bombing." 2023 WL 5221955, at *27 (citation omitted); see also Surette, 231 F. Supp. 2d at 270 (finding that woman who had lived with victim for over 20 years in bond recognized by family and colleagues as equivalent to marriage could recover for IIED despite not being legally married); cf. Aceto v. Islamic Republic of Iran, 2020 WL 619925, at *16 (D.D.C. Feb. 7, 2020) (rejecting spousal solatium award where couple had dated for less than two years before Khobar Towers bombing). Because Erika and Neuman have

not presented sufficient evidence to establish that their relationship was the "functional equivalent of marriage" at the time Neuman was injured, the Court finds that the standard spousal award is not warranted. Gration, 2023 WL 5221955, at *27 (quoting Bettis, 315 F.3d at 337). The Court therefore concludes that solatium damages are inappropriate here.

    C.    <u>Baghdad Attacks</u>

In the early hours of the morning on March 9, 2005, an al Qaeda suicide bomber attacked the Al-Sadeer Hotel in central Baghdad. See PFFCL at 93. The hotel housed many U.S. civilian government contractors at the time, including Plaintiffs Wallace Byars, III, Dennis O'Malley, and Richard Vessell. See Am. Compl., ¶ 225. The deadly explosion that morning ripped through the hotel, killing two people and injuring others. Id., ¶¶ 226–27. And that was not the last time the hotel was targeted by al Qaeda insurgents. On July 25, 2005, the hotel was bombed again, killing at least a dozen people and injuring over a dozen more. Id., ¶¶ 257–58.

Plaintiffs Byars, O'Malley, and Vessell stayed at the Al-Sadeer Hotel as civilian employees of DynCorp International. See PFFCL at 93. Byars and O'Malley were at the hotel for both the March and July bombings, while Vessell was present for only the former attack. Id. Each of them requests damages for the pain and suffering they endured as a result of those attacks; Byars and O'Malley also request damages for economic losses. Id. at 93–94.

    1.    *Wallace Byars, III*

Byars arrived in Iraq on his DynCorp assignment "in early March 2005." Id. at 96. "Only a few days after his arrival" at the Al-Sadeer Hotel to begin his contract, the first suicide bomber attacked the hotel with "several thousand pounds of explosives." Id. at 96–97 (quotation marks omitted). While he was not injured in the attack, the devastation that he saw on the morning of March 9 was profoundly disturbing and affected him for years. Id. at 97–99. He

continued his contract with DynCorp, but the attack left him so fearful that he could not sleep at night.  Id. at 98–99.  He also developed tinnitus and hearing loss.  Id. at 98.  Several months later, the hotel was attacked again as Byars slept inside.  Id. at 99.  Much like the first bombing, he was not physically injured in the blast, but he was traumatized by what he experienced that morning. Id. at 99–100.

After returning from Iraq, Byars was diagnosed with post-traumatic stress disorder and depression.  Id. at 103, 107.  He experienced flashbacks, irritability, hypervigilance, and a lack of motivation, among other things, which led him to withdraw from his friends and family.  Id. 102–05.  These psychological traumas also resulted in a "range of memory issues and cognitive challenges" that are substantial obstacles in his daily life.  Id. at 105.  In addition, he still grapples with "sustained hearing loss and has experienced tinnitus as a result of" the bombings in Iraq.  Id. at 109.

Byars requests $3 million in damages for the severe emotional injuries he incurred from both bombings, as well as $3,265,880.69 in economic losses given his permanent total disability rating from the Department of Labor.  Id. at 113–14.  Dr. Plumly submitted an expert report to calculate Byars's economic losses.  Id.  This calculation was based on (1) the income he would have received if he continued to work for DynCorp from 2006–2011 as he initially intended, id. at 96, (2) the income he would have received as a police officer and supervisor in South Carolina, and (3) the Social Security benefits he would have received upon retirement at age 67, minus taxes and adjusted to their present value.  See ECF No. 64-34 (Byars Expert Report) at 3–5.  This methodology generally comports with how economic loss was calculated in similar cases.  See, e.g., Murphy v. Islamic Republic of Iran, No. 06-596, ECF No. 55-1 (Loss Calculation) (D.D.C. June 10, 2010) (calculating economic loss for injured servicemember).  The

Court finds that the estimate is reasonable and thus awards $3,265,880.69 to Byars to compensate for economic loss.

As for pain and suffering, Byars primarily relies on an alternative framework in <u>Ackley v. Islamic Republic of Iran</u>, 2022 WL 3354720 (D.D.C. Aug. 12, 2022), to request an upward departure from the baseline award for psychological injuries to $3 million.  <u>See</u> PFFCL at 112; <u>see also</u> <u>Wamai</u>, 60 F. Supp. 3d at 92 (establishing baseline award of $1.5 million for victims who suffer only psychological injuries).  The plaintiffs in <u>Ackley</u> largely received damages in accordance with their Department of Veterans Affairs disability ratings —  $6 million for a 60% rating and $7 million for a 90–100% rating.  <u>See</u> 2022 WL 3354720, at *52–53, *54–55.  In particular, Byars analogizes his injuries to Richard R. Jiron's, who received a 60% VA disability rating and $6 million for "lacerations to his hands and feet" and severe emotional damage; David A. Krueger, who received $7 million and a 100% disability rating for "a concussion, hearing loss, tinnitus," and severe emotional damage; and Jeremy L. Parratt, who received the same award as Krueger and a 90% disability rating for PTSD and obstructive sleep apnea.  <u>See</u> PFCL at 112; <u>see also</u> <u>id.</u> at *28, *31, *53–*55.  Byars thus argues that, in light of his "permanent total disability" rating from the Department of Labor, an upward departure from the $1.5 million baseline award is warranted.  <u>See</u> PFFCL at 113 (quotation marks omitted).

The Court, however, declines to adopt the <u>Ackley</u> framework for awarding damages in this case.  As Byars acknowledges, "[T]he DynCorp contractors did not receive VA ratings, which are limited to servicemembers."  <u>Id.</u> at 112–113.  He is the only civilian victim in this case, moreover, to have received an analogous rating from the Department of Labor, and the Court is wary of adopting differing frameworks for each victim.  Such a scheme would not comport with the aforementioned guiding principle that "when calculating damages awards, the

Court must take pains to ensure that individuals with similar injuries receive similar awards."
Owens, 71 F. Supp. 3d at 259 (quotation marks omitted).  The Court thus applies the Wamai
framework to determine the amount of damages owed to Byars.

Byars sustained few to no physical injuries in the attacks.  His psychological injuries, as
mentioned above, thus merit a baseline award of $1.5 million.  See Wamai, 60 F. Supp. 3d at 92.
The Court sees little reason to depart from the baseline.  Indeed, Byars's situation is similar to
Edward Mwae Muthama's in Wamai, who received the baseline amount for the severe emotional
damage incurred from the days he spent assisting with the recovery efforts after the 1998
bombing of the United States Embassy in Kenya.  Id.  By contrast, Byars does not point to
extenuating circumstances that courts have previously relied on to support an upward departure
from the baseline.  See, e.g., Valencia v. Islamic Republic of Iran, 774 F. Supp. 2d 1, 17 (D.D.C.
2010) (awarding $3 million for soldier who attempted suicide twice after diagnosis of PTSD);
Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 84 (D.D.C. 2017) (awarding $2.5 million
to mother who witnessed her only child's death during terror attack).  The Court is loath to try to
compare the personal suffering of others.  It nevertheless finds that, in light of prior rulings in
this district, the circumstances of this case warrant $1.5 million in pain-and-suffering damages to
Byars.

    2.    *Dennis O'Malley*

Like Byars, Dennis O'Malley also arrived at the Al-Sadeer Hotel in Baghdad just a few
days before the first attack on the hotel.  See PFFCL at 116.  As he drank a cup of coffee in the
lobby on his third day in Iraq, he heard gunfire followed by a "deafening" explosion.  See ECF
No. 64-35 (Dennis O'Malley Decl.), ¶¶ 24–25.  The force of the blast sent him flying back
several feet, and the back of his head "hit one of the pillars along the wall."  Id., ¶ 25.  After

getting up, he could hear only a loud ringing in his ears.  Id.  He discovered several minutes later that his leg and the back of his head were lacerated by shattered glass.  See PFFCL at 117.  In the months following the attack, his leg alternated between a burning sensation and numbness, which a doctor in Kuwait diagnosed as a nerve injury.  Id.  The pain has persisted to this day.  Id.

Several months later, O'Malley "survived a second terrorist attack" at the Al-Sadeer Hotel.  Id. at 118.  Although he was not physically injured in the blast, the carnage that he witnessed in July was largely "a repeat performance" of the March attack.  See O'Malley Decl., ¶ 40.  He again saw intense devastation and carnage, including many friends among the wreckage, which "devastated" him.  See PFFCL at 119 (quotation marks omitted).  The nightmares that first appeared after the March bombing continued, and he again "had difficulty falling asleep" at night.  Id.  Following the second bombing, he moved frequently: first to Camp Victory, then to Kuwait while working for Agility Logistics, after which he lived in Afghanistan for a year as a senior advisor for the Afghanistan National Police, before finally returning to the United States.  See id.; O'Malley Decl., ¶¶ 46–52.

The nightmares that originated from the attacks persisted for years, and "[he has] not had a restful night of sleep since" his time in Iraq.  See O'Malley Decl., ¶ 42.  His performance at work suffered as well.  See PFFCL at 120.  His flashbacks and worsening anxiety led to severe consequences in his personal life as he wrestled with the trauma stemming from the attacks.  Id. at 122; O'Malley Decl., ¶¶ 61, 67.

These symptoms ultimately led to a diagnosis of post-traumatic stress disorder.  See PFFCL at 122–24.  He also experienced "symptoms of depression."  Id. at 125–26 (quotation marks omitted).  This psychological trauma would continue to plague him for years following the attacks.  Id. at 128–29.  On top of that, the nerve damage to his leg has limited his mobility;

he "cannot walk for prolonged periods of time" and "had to stop playing tennis." Id. at 129 (quotation marks omitted).

O'Malley requests $4 million in damages for the physical and emotional injuries he sustained from the attacks, as well as $1,503,556.62 in economic losses. Id. at 130–31. Dr. Plumly's calculation of O'Malley's lost income assumed that he would have completed his five-year contract at the Ministry of Interior in Afghanistan, after which he would have finished his career working as a chief of police in Pennsylvania and then collected Social Security payments until his death at roughly 82 and a half, minus taxes and adjusted to its present value. See ECF No. 64-41 (O'Malley Expert Report) at 3–4. Plumly then subtracted the income that O'Malley actually obtained over the course of his post-Iraq life in America as a "police instructor, security officer, and probation officer." Id. at 3. The Court again concludes that this is a reasonable methodology for calculating economic loss. See Murphy, Loss Calculation. The estimate itself is also reasonable, so the Court will award $1,503,556.62 in economic-loss damages.

Like Byars, O'Malley relies on Ackley's alternative framework to justify his direct-injury damages request of $4 million. See 2022 WL 3354720. He argues that his injuries are similar to Richard R. Jiron's, who, based on a 60% VA disability rating, received $6 million for the "lacerations to his hands and feet, PTSD, episodes of insomnia, depression, anxiety, [and] some permanent hearing loss and tinnitus" resulting from the Khobar Towers bombing. See PFFCL at 130; see also Ackley at *62. The Court appreciates the similarities between the two victims in these cases. Importing Ackley's damages calculation to this case, however, is even less justified for O'Malley than for Byars. Neither received a VA disability rating, unlike Jiron in Ackley. O'Malley has alleged no rating, moreover, that might arguably serve as a substitute, as did Byars with his attempt to substitute his Department of Labor disability rating. Perhaps sensing this

20

shortcoming, O'Malley reduced his request from the $6 million that Jiron received in <u>Ackley</u> to $4 million without explanation.  Having already found, however, that <u>Ackley</u> is ill suited as a reference here, the Court will evaluate O'Malley's injuries under the <u>Wamai</u> framework.

That yields a $2.5 million award.  The <u>Wamai</u> framework differentiates between "lacerations and contusions caused by shrapnel," which merit an award of $2 million, and the more severe physical injuries such as "broken bones, head trauma, [or] some hearing or vision impairment" that warrant $2.5 million.  <u>See</u> 60 F. Supp. 3d at 92.  Nerve damage, however, especially when it persists long past the attack, typically justifies an upward departure.  <u>See</u> <u>Murphy v. Islamic Republic of Iran</u>, 740 F. Supp. 2d 51, 77–78 (D.D.C. 2010).  O'Malley suffered physical injuries: lacerations to his leg and head, the former resulting in nerve damage, as well as severe emotional damage.  These injuries, discounting the nerve damage, place him closer to $2 million than $2.5 million.  The Court recognizes, however, that O'Malley continues to suffer from limited mobility stemming from the nerve damage he sustained during the attack.  <u>See</u> PFFCL at 129.  The Court therefore finds that an upward deviation to $2.5 million is appropriate.

### 3.    *Richard Vessell*

Richard Vessell arrived in Iraq as a civilian contractor for DynCorp in February 2005.  <u>See</u> ECF No. 64-42 (Richard Vessell Decl.), ¶ 10.  Like Byars and O'Malley, he stayed at the Al-Sadeer Hotel at the beginning of his contract.  <u>Id.</u>

On March 9th, he suddenly awoke "on the floor of [his] room" thanks to the "concussive force" of the explosion that destroyed the hotel.  <u>Id.</u>, ¶ 12.  When Vessell opened his eyes, he could see that his "room was filled with smoke" and smelled "the odor of everything burning."  <u>Id.</u>, ¶ 13.  He felt "a ringing in [his] ears" and "pain in [his] back," and he possibly was

concussed.  Id., ¶ 14.  Vessell sprang into action, "shift[ing] into some type of fight or flight mode, and the fight mode took over."  Id., ¶ 15.  He went floor to floor to check for injured people and to assess the extent of the damage to the building.  See PFFCL at 133.  Like the others who survived the explosion, he saw enough carnage and destruction throughout the hotel to alter the course of his life.  Id. at 134.  Vessell nevertheless heroically "did [his] best to locate and assist . . . the injured."  Vessell Decl., ¶ 19.  The "anxiety and fear" he felt was like "walking through a combat zone."  Id., ¶ 20.  "That night, another DynCorp employee was moved into [Vessell's] room, and as they listened to continuous gunfire, they sat on the floor with [their] backs against the wall," which "terrifi[ed]" him.  See PFFCL at 135 (quotation marks omitted).  After the attack, "Vessell remained in Iraq to fulfill his contract," id., before returning home to work as a police officer.  Id. at 137.

Those tragic and disturbing images are still with [him] today."  Vessell Decl., ¶ 21.  Indeed, he "was not the same after the attack."  Id., ¶ 26.  "Images of what [he] had seen in Iraq hit [him] out of the blue while" he was at work as a police officer, "as well as at places like the movies or in restaurants."  Id., ¶ 36.  These images "bring[] up upsetting, powerful emotions, and [he] feel[s] anxious as [he] remember[s] each memory."  Id., ¶ 35.  His personality changed as well: from "happy, always joking, fun-to-be-around" to "more easily annoyed and quick to anger" with "frequent outbursts" after the attack.  See PFFCL at 138 (quotation marks omitted).  In addition to the flashbacks and nightmares that started after the attack, Vessell also reported feeling "isolated, depressed, and anxious."  Id. at 139.  To deal with these challenges, Vessell received counseling for PTSD in 2023.  Id.  All told, he has "thought about what [he] experienced every day, sometimes multiple times each day," though that frequency has lessened in recent years to once a month.  See Vessell Decl., ¶ 45.

Vessell requests $1.5 million in damages for his emotional injuries.  See PFFCL at 140. The Court agrees that such an award is adequate to compensate him for his psychological trauma.  See Worley v. Islamic Republic of Iran, 177 F. Supp. 3d 283, 286 (D.D.C. 2016) (noting general practice to award $1.5 million for psychological harms but no physical injuries); Wamai, 60 F. Supp. 3d at 92 (similar).

  D.  Khutaylah Attack

On May 9, 2005, then-Corporal Jason Goldsmith was leading a convoy to Nasiriyah when it was "ambushed and attacked by a combination of RPGs and IEDs."  PFFCL at 142.  A suicide bomber then drove into the side of his Humvee.  Id.  The attack injured "five service members in the vehicle, including" Goldsmith.  Id.  Because "the blast . . . rendered [him] unconscious for about six hours," the details of the attack come from what various witnesses later told him.  See ECF No. 64-45 (Jason Goldsmith Decl.), ¶ 13.

After the initial explosions, "[a]n RPG struck" the front of the Humvee, "and it caused [Goldsmith] to catch on fire."  Id.  One of his fellow servicemembers subsequently dragged him out of the vehicle and extinguished the fire.  Id.  He was then loaded into another vehicle for evacuation, though he was "dropped during the rescue, hitting his head again."  PFFCL at 144. As that vehicle drove away, "he sustained" yet another "instance of head trauma, when his head struck metal as" an IED "exploded underneath the vehicle carrying him."  Id. (quotation marks omitted).  At one point during the journey, moreover, "he was observed in transport not to be breathing" and thus suffered a "possible anoxic brain injury."  Id. at 146 (quotation marks omitted).  Goldsmith was subsequently evacuated for medical treatment, and after he awoke, he struggled to "form[] memories for about 6 hours."  PFFCL at 144.  He returned to his unit after one week.  See Goldsmith Decl., ¶ 17.  All told, "[he] sustained burns, lacerations, and bruising

to the right side of [his] face and [his] right forearm," as well as "from [his] right thigh all the way to [his] butt." Id., ¶ 13.

After he returned to the unit, he was given light duty for 30 days to aid in his recovery, during which "he limped while walking and his burns needed regular attention to prevent infection." PFFCL at 145. He ultimately left Iraq in the fall of 2005 and returned to the United States. See Goldsmith Decl., ¶ 19.

The attack left Goldsmith with lasting physical issues. In 2008, he was first diagnosed with TBI. See PFFCL at 146. The condition manifested in severe headaches that began right after the attack and persist to the present day. Id. at 148. He was also unable to sleep peacefully; he told a doctor in 2009 that "he could not recall the last time he had restful sleep." Id. at 149. He also developed other physical conditions as a result of the attack, such as gastroesophageal reflux disease and irritable bowel syndrome. Id. at 165.

Goldsmith's cognitive issues stemming from TBI, particularly his deteriorated memory, also pose severe challenges. He is almost completely reliant on his wife to help him remember daily tasks such as bathing or brushing his teeth, and he experiences real difficulties managing his medical appointments and treatment needs. Id. at 156–57, 160. Sometimes these lapses in memory endanger his family, such as when he "burnt half [his backyard] because he started a fire and forgot about it." Id. at 157 (quotation marks omitted). Aside from memory issues, Goldsmith also suffers from obsessive compulsions and mood problems. He and his wife report that he often has involuntary facial expressions, such as smiling and laughing when someone is upset, in addition to other manic behaviors that he cannot control. Id. at 156; Goldsmith Decl., ¶ 34. The memory problems and obsessive behaviors require his wife to monitor him "at all times." PFFCL at 157. Goldsmith was consequently diagnosed with PTSD, depression, and

anxiety.  Id. at 160–61.  On top of the symptoms just discussed, he also reported "repetitive checking behaviors" such as "pac[ing] the house [and] checking his locks several times a day." Id. at 160 (quotation marks omitted).  He additionally suffers from "daymares," where he relives the events of the attack in vivid detail at seemingly random times during the day, as well as nightmares.  Id. at 153–54, 164.  As a result of these numerous and varied issues, Goldsmith faces severe challenges finding and retaining stable employment.  Id. at 167.

Goldsmith requests $10 million to compensate for his physical and emotional injuries, as well as $3,700,729.01 in economic losses due to his diminished ability to work..  Id. at 168–71. Plumly calculated his lost income by estimating the income he would have received but for the attack, which assumed he would have spent twenty years in the military.  See ECF No. 64-51 (Goldsmith Expert Report) at 3.  Following Goldsmith's service, Plumly further assumes that he would have found employment as a high-school science teacher until his retirement, after which he would have received both a military pension and Social Security retirement benefits.  Id. at 3–4.  Plumly then adjusted this figure for taxes and to its present value and subtracted the income Goldsmith has actually earned.  Id. at 4, 10.  These assumptions are reasonable, and the Court is satisfied with the evidentiary bases for the calculation provided in the report.  It thus awards $3,700,729.01 in economic-loss damages.

As for his direct-injury claim, Goldsmith primarily relies on a $20 million award in Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40 (D.D.C. 2006), and a $17 million award in Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258 (D.D.C. 2003), for significant brain injuries.  See PFFCL at 168.  Neither case is based on the Wamai framework.  Paul Blais was severely injured in the Khobar Towers bombing; he suffered grievous brain trauma and psychological injuries after being trapped amidst the rubble after the explosion.  See Blais, 459 F.

Supp. 2d at 49–51.  Diana Campuzano suffered similar head trauma, psychological damage, and permanent damage to her vision, hearing, and sense of taste and smell from the bombing of a pedestrian mall in Israel.  See Campuzano, 281 F. Supp. 2d at 263–64.  Both Blais and Campuzano spent lengthy periods in the hospital, and Blais was additionally in "a vegetative state for approximately five weeks."  Blais, 459 F. Supp. 2d at 50 (noting victim spent four months in hospital and some of that time in vegetative state); Campuzano, 281 F. Supp. 2d at 263 (noting victim spent six weeks in hospital).  Both victims, moreover, sustained such severe brain trauma that they required intensive medical and surgical intervention to repair it.  See Blais, 459 F. Supp. 2d at 50 ("The examining physician at Walter Reed diagnosed Blais as having severe axonal brain jury, anoxic brain injury, and organic encephalopathy . . . need[ing] constant supervision."); Campuzano, 281 F. Supp. 3d at 263 ("A team of doctors performed a five-hour craniotomy on Ms. Campuzano to remove multiple bone fragments, repair the ruptures in her brain coverings, and repair her anterior skull base fracture with mini plates, bone cement, and her own harvested tissue.").

        Goldsmith's situation differs in crucial respects from Blais's and Campuzano's.  Because Goldsmith's hospitalization was cut short by his admirable desire to return to his unit, his stay only lasted "for a couple of days," and it is difficult to imagine it extending for the weeks and months at issue in Blais and Campuzano.  See PFFCL at 145.  His brain injuries, while severe, were not dire enough to require the kind of medical and surgical intervention that Blais and Campuzano required to save their lives.  Compare id. (describing no complex medical treatment or surgical repairs), with Blais, 459 F. Supp. 2d at 50 (requiring constant medical supervision for months while hospitalized), and Campuzano, 281 F. Supp. 3d at 263 (requiring complex surgical intervention to repair structural damage to skull).

Indeed, "those awards" in <u>Blais</u> and <u>Campuzano</u> were themselves "anomalies" and "fall[]

well outside the heartland of what courts today typically award for pain and suffering," such that

they "largely have [been] rejected . . . in the decades since their decision." <u>Mark v. Islamic</u>

<u>Republic of Iran</u>, 626 F. Supp. 3d 16, 36–37 (D.D.C. 2022) (rejecting <u>Blais</u> and <u>Campuzano</u> as

adequate frameworks for pain-and-suffering damages under FSIA); <u>see also</u> <u>Cabrera</u>, 2022 WL

2817730, at *45 (declining to follow <u>Campuzano</u>).

The Court thus uses the <u>Wamai</u> framework, as it has for all other victims, to determine

the proper amount of damages owed to Goldsmith. The framework establishes a "baseline"

award of $5 million, which is typically awarded for injuries "involving some mix of serious

hearing or vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy

hospital stays, serious spinal or head trauma, and permanent injuries." 60 F. Supp. 3d at 92–93.

A plaintiff named Pauline Abdallah, for example, received the $5 million baseline award for the

"severe shrapnel wounds . . . , third-degree burns, . . . severe hearing loss," and "severe

emotional damage" she suffered in the bombing of the United States Embassy in Nairobi. <u>Id.</u> at

93.

Courts often depart upward to $7.5 million, however, when a plaintiff suffered brain

damage. <u>Id.</u>; <u>see also</u> <u>Valore</u>, 700 F. Supp. 2d at 84 (noting upward departures where "victims

suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost

vision and hearing, or were mistaken for dead"). For instance, Livingstone Busera Madahana

received an upward departure to $7.5 million in part because of the "physical therapy, vocational

rehabilitation," and "speech and cognitive therapy" that he needed as a result of the skull fracture

and head trauma he sustained from the bombing of the embassy. <u>Wamai</u>, 60 F. Supp. 3d at 93.

The burns, laceration, and head trauma Goldsmith suffered resemble the injuries sustained by Pauline Abdallah.  Wamai, 60 F. Supp. 3d at 93.  At first glance, therefore, the baseline award of $5 million appears fitting.  Id., No. 08-1359, ECF No. 245 at 2 (awarding Abdallah $5 million for pain and suffering).  Goldsmith, however, was left with cognitive impairments that continue to significantly hamper his day-to-day life more than twenty years after the attack.  See PFFCL at 155–56.  Such brain damage and lasting cognitive impairment merit an upward departure to $7.5 million, which the Court will award.

      E.      Second Fallujah Attack

In September 2004, mere days after being deployed to Iraq for the first time, Lance Corporal Thomas Vriens was present during two attacks on his convoy.  See PFFCL at 173–75.  The convoy was transporting military equipment to Fallujah along a road "often referred to as IED . . . alley."  Id. at 174 (quotation marks omitted).  "Two hours after [they] left, [the] convoy was attacked."  ECF No. 64-53 (Vriens Decl.), ¶ 25.  The vehicle in front of Vriens was hit by an IED; Marines from the convoy took four hours to clear the scene and evacuated the wounded men in the damaged vehicle.  Id., ¶¶ 26–27.

Soon after resuming the trip, Vriens's vehicle was hit directly by an IED.  Id., ¶ 27.  The vehicle "rolled down an embankment," and Vriens "hit [his] back" on the bench in the vehicle.  Id., ¶¶ 27, 32.  The blast killed the vehicle's deriver, who was a friend of Vriens's.  Id., ¶¶ 25, 30.  After evacuating the wounded, the convoy again resumed its journey and eventually reached a base just outside Fallujah, where the unit remained for the rest of its tour.  Id., ¶¶ 28–29, 31.

The next day, Vriens was examined by a doctor.  As a result of the attack, Vriens "sustained hearing damage including tinnitus and bilateral hearing loss . . . [; he] was also concussed."  Id., ¶ 32.  He continued to serve in Iraq for a few months before returning home to

be present for the birth of his son and to help care for his stepchild.  See PFFCL at 176.  He was formally discharged from the military in April 2006.  Id.

The psychological trauma he sustained in Iraq manifested shortly after his return home.  "In the days that followed [his return], the guilt of surviving the attack that took the life of [his] friend weighed heavily" on him.  See Vriens Decl., ¶ 37.  "[He] started having nightmares about what [he] went through and was often unable to sleep."  Id.  Several years later, Vriens was diagnosed by the local VA hospital with PTSD, based on consistent "[r]ecurrent and distressing recollections of [the attack]," nightmares, and flashbacks.  See PFFCL at 177 (quotation marks omitted).  Vriens also reported that he suffered from "[m]ild memory loss," as well as "irritability . . . , difficulty concentrating, and hypervigilance."  Id. at 178 (cleaned up).  Fortunately, however, "[t]he PTSD-related nightmares and flashbacks [he] experienced upon" his return "occur less frequently" nowadays.  See Vriens Decl., ¶ 56.

Right after the attack, Vriens "suddenly had difficulty remembering things[,] including people's names and simple driving instructions."  Id., ¶ 55.  As time passed, his memory further deteriorated, "[he] had to write everything down for work," and he could not remember "significant dates" or events that had happened decades earlier in his life.  Id.  Because of his memory issues, Vriens got tested for TBI.  Id.  The test was inconclusive, but Vriens maintains that his symptoms are consistent with TBI compounded by PTSD.  Id.

The attack also left Vriens with long-lasting physical injuries.  Most significant is chronic back pain.  "The impact of and severity of his ongoing pain varie[s]."  PFFCL at 182.  He "frequently get[s] back spasms" that hamper his mobility and require him to visit a chiropractor regularly to avoid further pain.  Id. at 182, 184.  He "cannot stand for longer than [an] hour without" worsening pain, and the condition has severely inhibited his ability to sleep, as he often

wakes up "experiencing numbness and tingling in [his] arm and hand." <u>Id.</u> at 184 (quotation

marks omitted). As a result of this condition, "[he] no longer lift[s] weights or run[s] long

distances." <u>Id.</u> at 184–85 (quotation marks omitted). Other physical symptoms resulting from

the attack have manifested as well. In 2019, he was diagnosed with irritable bowel syndrome,

which likely developed soon after the attack and significantly worsened in the lead-up to his

diagnosis. <u>Id.</u> at 180–81. He also believes that his tinnitus and hearing loss originate from the

attack, though no medical records corroborate this theory. <u>Id.</u> at 185.

Vriens requests $4 million to compensate for these injuries. <u>Id.</u> at 186. In doing so, he

draws a comparison to Joseph P. Jacobs, a soldier at the bombing of a Marine barracks in

Lebanon who received $5 million, the baseline award in <u>Wamai</u>, for "a shoulder injury," ongoing

"neck, shoulder and back pain," and "lasting and severe psychological problems." <u>Peterson II</u>,

515 F. Supp. 2d at 55. That award, however, would be incongruent with what the Court has

awarded other victims in this case. In particular, O'Malley, who suffered lacerations leading to

lasting nerve damage and severe psychological issues, was awarded $2.5 million for his injuries.

<u>See</u>, *supra*, Section III.C.2.

Under the <u>Wamai</u> framework, moreover, Vriens's injuries are far closer to the "minor

[physical] injuries (such as lacerations and contusions caused by shrapnel), accompanied by

severe emotional injuries" that typically warrant $2 million awards, as opposed to injuries such

as "many broken bones, severe shrapnel wounds or burns, lengthy hospital stays, serious spinal

or head trauma" that warrant $5 million awards, or even the "spinal injuries not resulting in

paralysis, more serious shrapnel injuries, head trauma, or serious hearing impairment" that

warrant $3 million awards. <u>See</u> 60 F. Supp. 3d at 92–93. The Court, accordingly, finds that $2

million is appropriate to compensate Vriens for his injuries.

**IV.    Conclusion**

For these reasons, the Court will enter default judgment for Plaintiffs in the amounts listed above.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 18, 2025